ALMEIDA LAW GROUP LLC

Victor J. Sandoval, SBN 344461
victor@almeidalawgroup.com
3415 South Sepulveda Boulevard,
Suite 1121
Los Angeles, CA 90034
Telephone: 562.534.5907

[additional counsel listed below]

*Attorneys for Plaintiff and the Proposed Classes*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZACHARY BOSTICK, individually and on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INTUIT, INC. d/b/a TURBOTAX, INTUIT TT OFFERINGS, INC., CK PROGRESS, INC. d/b/a CREDIT KARMA LLC, MVB BANK, INC., FIRST CENTURY BANK, N.A., SANTA BARBARA TAX PRODUCTS GROUP, LLC, and GREEN DOT BANK,<br><br>Defendants. | CASE NO. 3:26-CV-01444-H-VET<br><br>**PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Judge: Hon. Marilyn L. Huff<br><br>Date: September 14, 2026<br>Time: 10:30 a.m.<br>Place: Courtroom 12A |

# TABLE OF CONTENTS

INTRODUCTION .......... 1
BACKGROUND .......... 3
I. THE MILITARY LENDING ACT .......... 3
II. THE LOAN AT ISSUE .......... 5
III. PLAINTIFF ZACHARY BOSTICK .......... 6
LEGAL STANDARD .......... 7
ARGUMENT .......... 8
I. THE COMPLAINT'S DEFENDANT-SPECIFIC ALLEGATIONS DEFEAT THE SHOTGUN-PLEADING CHALLENGE .......... 8
II. THE REFUND ADVANCE LOAN CONSTITUTES "CONSUMER CREDIT" SUBJECT TO A FINANCE CHARGE .......... 10
A. Refund Anticipation Loans Are a Named Category of MLA Consumer Credit. .......... 10
B. The Loan Is "Credit." Plaintiff Incurred Debt and Deferred Its Payment. .......... 11
C. Any Single-Installment Argument Fails. .......... 13
D. Whether the Loan Is Subject to a Finance Charge Is a Merits Question That Should Not Be Resolved Against Plaintiff on the Pleadings. .......... 14
E. The MLA Must Be Construed Broadly to Effectuate Its Protective Purpose. .......... 16
III. EACH DEFENDANT QUALIFIES AS A "CREDITOR" OR MLA-LIABLE PARTICIPANT .......... 19
A. Intuit and Credit Karma Have Functional Control Over the Transaction. .......... 19
B. MVB Bank's Role Is Integral to the Delivery of Loan Proceeds. . 23

C. Green Dot Bank and SBTPG Exercise Functional Control Over the Repayment Mechanism.......... 24

IV. FEES AND CHARGES WERE PROPERLY INCLUDED IN THE MAPR CALCULATION.......... 27

A. A Fee Need Not Be Mandatory to Qualify as a Finance Charge... 28

B. Whether Fees Were Imposed as a Condition of Credit Is a Factual Question Not Resolvable at the Pleading Stage.......... 29

C. The Comparable-Cash-Transaction Exclusion Does Not Apply... 30

D. The Timing of a Fee Relative to Origination Does Not Defeat Its Status as a Finance Charge. .......... 34

E. Plaintiff Does Not Allege the Principal Is Part of the Finance Charge.......... 34

F. The Participation-Fee and Ancillary-Product Regulations Bring These Charges Within the MAPR Regardless of the Comparable-Cash Analysis. .......... 35

G. FCB's "$0.00 in Fees" Disclosure Cannot Resolve the Finance-Charge Dispute at the Pleading Stage.......... 36

V. PLAINTIFF HAS STANDING FOR EACH COUNT.......... 37

VI. COUNT I STATES A CLAIM UNDER THE MLA'S ACCOUNT-ACCESS PROHIBITION.......... 39

VII. COUNT III STATES A CLAIM: THE ARBITRATION AND WAIVER PROVISIONS VIOLATE THE MLA.......... 41

A. The MLA's Dual Prohibition Framework. .......... 41

B. FCB's Savings Clause Does Not Resolve the Arbitration Count.. 43

C. The MLA's Civil Liability Provision Authorizes Suit for Unlawful Terms. .......... 45

D. A Third Arbitration Agreement Independently Supports This Claim.......... 46

VIII. THIS COURT HAS PERSONAL JURISDICTION OVER MVB BANK ........ 46
IX. MVB'S VENUE MOTION FAILS ........ 49
X. IN THE ALTERNATIVE, LEAVE TO AMEND SHOULD BE GRANTED ........ 50
CONCLUSION ........ 50

# TABLE OF AUTHORITIES

## Cases

*Adobe Sys. Inc. v. Blue Source Grp., Inc.*,
125 F. Supp. 3d 945 (N.D. Cal. 2015) .......... 9

*Arrington v. Colleen, Inc.*,
2001 WL 34117735 (D. Md. Mar. 29, 2001) .......... 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 7

*Atl. Marine Constr. Co. v. U.S. Dist. Ct.*,
571 U.S. 49 (2013) .......... 3, 49

*Attias v. CareFirst, Inc.*,
346 F.R.D. 1 (D.D.C. 2024) .......... 38

*Barton v. Procter & Gamble Co.*,
766 F. Supp. 3d 1045 (S.D. Cal. 2025) .......... 50

*Basile v. H&R Block, Inc.*,
897 F. Supp. 194 (E.D. Pa. 1995) .......... 30–31

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 7

*Berryhill v. Rich Plan of Pensacola*,
578 F.2d 1092 (5th Cir. 1978) .......... 20

*Briskin v. Shopify, Inc.*,
135 F.4th 739 (9th Cir. 2025) .......... 47

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) .......... 46–47

*Burgess v. United States*,
553 U.S. 124 (2008) .......... 18

*Burrison v. FloatMe, Corp.*,
2026 WL 444638 (D. Mass. Feb. 17, 2026) .......... 42

*Burnett v. Ala Moana Pawn Shop*,
3 F.3d 1261 (9th Cir. 1993)....................3

*California Pawnbrokers Ass'n v. Carter*,
2016 WL 6599819 (E.D. Cal. Nov. 7, 2016)....................4, 17

*CFPB v. MoneyLion Techs. Inc.*,
799 F. Supp. 3d 152 (S.D.N.Y. 2025)....................18, 23, 35–36

*Chapman v. Krutonog*,
256 F.R.D. 645 (D. Haw. 2009)....................48

*Cooper v. Tokyo Elec. Power Co., Inc.*,
166 F. Supp. 3d 1103 (S.D. Cal. 2015)....................50

*Davis v. Pacific Capital Bank, N.A.*,
550 F.3d 915 (9th Cir. 2008)....................10

*Digital Realty Tr., Inc. v. Somers*,
583 U.S. 149 (2018)....................18

*Doe 1 v. AOL LLC*,
552 F.3d 1077 (9th Cir. 2009)....................49

*E.C. Warner Co. v. W. B. Foshay Co.*,
57 F.2d 656 (8th Cir. 1932)....................5, 17

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)....................42

*Espin v. Citibank, N.A.*,
126 F.4th 1010 (4th Cir. 2025)....................41–42

*Feeman v. Bridge It, Inc.*,
826 F. Supp. 3d 505 (S.D.N.Y. 2026)....................1, 10, 14, 28, 32, 42

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021)....................47

*Garcia v. Truist Fin. Corp.*,
825 F. Supp. 3d 1149 (C.D. Cal. 2026)....................47

*Gemini Techs., Inc. v. Smith & Wesson Corp.*,
931 F.3d 911 (9th Cir. 2019)....................................................................49

*Gibson v. City of Portland*,
165 F.4th 1265 (9th Cir. 2026)...............................................................2, 8

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
607 F.3d 453 (7th Cir. 2010)....................................................................38

*Hamilton v. York*,
987 F. Supp. 953 (E.D. Ky. 1997) ...........................................................13

*Hidalgo v. JPMorgan Chase Bank, N.A.*,
2025 WL 1370488 (S.D. Cal. May 12, 2025)..............................................47

*Holbert v. Fremont Inv. & Loan*,
179 Cal. App. 4th 1067 (2009)................................................................30

*Household Credit Servs., Inc. v. Pfennig*,
541 U.S. 232 (2004) .....................................................................2, 14, 30

*Huertas v. Foulke Mgmt. Corp.*,
2021 WL 5755081 (3d Cir. Dec. 3, 2021) ..................................................31

*Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.*,
240 F. Supp. 3d 206 (D.D.C. 2016) ....................................................4, 36

*Huskey v. Wyndham Vacation Resorts, Inc.*,
2026 WL 604875 (M.D. Fla. Feb. 19, 2026) ......................................37, 39

*In re Bare Escentuals, Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010) ...............................................7, 36

*In re Wash. Mut. Overdraft Prot. Litig.*,
201 F. App'x 409 (9th Cir. 2006) ............................................................33

*Intri-Plex Techs. v. Crest Grp., Inc.*,
499 F.3d 1048 (9th Cir. 2007)..................................................................50

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988, 998 (9th Cir. 2018)..................................................7, 20, 24, 36

*Lingard v. Holiday Inn Club Vacations, Inc.*,
2023 WL 4661963 (M.D. Fla. July 20, 2023) ........................................ 38

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ........................................ 44

*Loughrin v. United States*,
573 U.S. 351 (2014) ........................................ 16

*Louis v. Bluegreen Vacations Unlimited, Inc.*
2024 WL 2873778 (11th Cir. June 7, 2024) ........................................ 39

*Lowe v. MoneyLion Techs. Inc.*,
822 F. Supp. 3d 374 (S.D.N.Y. 2026) ........................................ 14

*Mikulsky v. Bloomingdale's, LLC*,
713 F. Supp. 3d 833 (S.D. Cal. 2024) ........................................ 9

*Moss v. Cleo AI Inc.*,
799 F. Supp. 3d 1152 (W.D. Wash. 2025) ........................................ 11

*Moss v. Klover Holdings, Inc.*,
2026 WL 622653 (N.D. Ill. Mar. 5, 2026) ........................................ 14

*M/S Bremen v. Zapata Off-Shore Co.*,
407 U.S. 1 (1972) ........................................ 49

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ........................................ 44

*Nat'l Urb. League v. Ross*,
508 F. Supp. 3d 663 (N.D. Cal. 2020) ........................................ 37

*Nicolas v. Deposit Guar. Nat. Bank*,
182 F.R.D. 226 (S.D. Miss. 1998) ........................................ 33

*Opportunity Fin., LLC v. Hewlett*,
No. 22STCV08163, (Cal. Super. Ct. May 19, 2026) ........................................ 21

*Orubo v. Activehours, Inc.*,
780 F. Supp. 3d 927 (N.D. Cal. 2025) ........................................ 4, 13, 17, 28

*Orubo v. Activehours, Inc.*,
826 F. Supp. 3d 1071 (N.D. Cal. Mar. 16, 2026)....................................4, 7, 27

*Pechinski v. Astoria Federal Savings & Loan Association*
345 F.3d 78 (2d Cir. 2003)...........................................................................33

*People v. JTH Tax, Inc.*
212 Cal. App. 4th 1219 (2013).....................................................................20

*Quildon v. Intuit, Inc.*,
2012 WL 1902021 (N.D. Cal. May 25, 2012) ...............................................15

*Ramirez v. Activehours, Inc.*,
828 F. Supp. 3d 1040 (N.D. Cal. Mar. 25, 2026)..........7–8, 14–16, 24, 28, 34

*Revell v. Grant Money, LLC*,
808 F. Supp. 3d 1036 (N.D. Cal. 2025) ................................12, 15–17, 32, 45

*Ridha v. Mortg. Elec. Registration Sys., Inc.*,
2010 WL 4867416 (E.D. Mich. Nov. 23, 2010) ............................................21

*Rodriguez v. Aquatic Sales Sols. LLC*,
735 F. Supp. 3d 1208 (C.D. Cal. 2024).........................................................48

*Russell v. Dave Inc.*,
812 F. Supp. 3d 998 (C.D. Cal. 2025).............................14–15, 28–29, 34, 42

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004)...........................................................................8

*Soo Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017)..........................................................................27

*Steines v. Westgate Palace, L.L.C.*,
2025 WL 3776911 (M.D. Fla. Dec. 8, 2025)........................................37, 39

*Steines v. Westgate Palace, L.L.C.*,
113 F.4th 1335, (11th Cir. 2024).....................................................41–42, 45

*Thompson v. 10,000 RV Sales, Inc.*,
130 Cal. App. 4th 950 (2005)........................................................................30

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ....................................................................................38

*Tripp v. Charlie Falk's Auto Wholesale Inc.*,
290 F. App'x 622 (4th Cir. 2008) ...................................................................31

*Turner v. E-Z Check Cashing, Inc.*,
35 F. Supp. 2d 1042 (M.D. Tenn. 1999) ........................................................13

*United States v. United Healthcare Ins. Co.*,
848 F.3d 1161 (9th Cir. 2016)..........................................................................9

*United States v. Wenner*,
351 F.3d 969 (9th Cir. 2003)...........................................................................16

*United States v. Woods*,
571 U.S. 31 (2013) ..........................................................................................16

*Van v. LLR, Inc.*,
962 F.3d 1160 (9th Cir. 2020).........................................................................38

*Veale v. Citibank, F.S.B.*
85 F.3d 577 (11th Cir. 1996)...........................................................................32

*Vega v. First Fed. Sav. & Loan Ass'n of Detroit*,
622 F.2d 918 (6th Cir. 1980)...........................................................................33

*Vickery v. Empower Fin., Inc.*,
2025 WL 2841686 (N.D. Cal. Oct. 7, 2025)............................................42, 45

*White v. Diamond Motors, Inc.*,
962 F. Supp. 867 (M.D. La. 1997) ..................................................................31

*Wojcik v. Courtesy Auto Sales, Inc.*,
2002 WL 31663298 (D. Neb. Nov. 25, 2002)..................................................21

*Wood v. Omni Fin. of Nev., Inc.*,
2023 WL 3766524 (E.D. Va. May 31, 2023)...................................................37

*Zawikoski v. Beneficial*, No. 1:98-cv-02178,
Dkt. 934 (N.D. Ill. Feb. 27, 2004)...................................................................21

*Zions Bancorporation, N.A. v. JPMorgan Chase Bank, N.A.*,
2021 WL 3406641 (S.D. Cal. Aug. 3, 2021) ....................47

**Statutes**

10 U.S.C. § 987 ....................1
10 U.S.C. § 987(a) ....................11, 37
10 U.S.C. § 987(b) ....................4, 30
10 U.S.C. § 987(e)(1) ....................26
10 U.S.C. § 987(e)(3) ....................38, 41–42, 44–45, 49
10 U.S.C. § 987(e)(5) ....................25, 39
10 U.S.C. § 987(f)(1) ....................22
10 U.S.C. § 987(f)(4) ....................4, 16, 38, 41–42, 45
10 U.S.C. § 987(e)(5) ....................25
10 U.S.C. §§ 987(f)(5)(A) ....................22, 38, 45
10 U.S.C. § 987(i)(3) ....................18
10 U.S.C. § 987(i)(5) ....................19
10 U.S.C. § 987(i)(5)(B) ....................22, 26
10 U.S.C. § 987(i)(6) ....................11
15 U.S.C. § 1602(f) ....................11
15 U.S.C. § 1640(a) ....................22
15 U.S.C. § 1641(a) ....................22
28 U.S.C. § 1391 ....................49
28 U.S.C. § 1404 ....................49
28 U.S.C. § 1406 ....................49

**Regulations**

12 C.F.R. Pt. 1026, Supp. I, ¶ 4(a)-1 ....................30
12 C.F.R. Pt. 1026, Supp. I, Part 2 ....................31
12 C.F.R. § 1026.4(a) ....................15–16, 27, 36

12 C.F.R. § 1026.17(d) ....................21, 26
32 C.F.R. § 232.3(f)(1) ....................11, 13, 16, 27
32 C.F.R. § 232.3(h) ....................11–12
32 C.F.R. § 232.3(i)(1) ....................19, 25
32 C.F.R. § 232.3(i)(2) ....................19, 22, 25
32 C.F.R. § 232.3(i)(3) ....................19
32 C.F.R. § 232.3(n) ....................27
32 C.F.R. § 232.3(p) ....................27
32 C.F.R. § 232.4(c)(1) ....................33, 35
32 C.F.R. § 232.8(e)(1) ....................40
32 C.F.R. § 232.8(e)(3) ....................40
61 Fed. Reg. 49237 (Sept. 19, 1996) ....................28, 34
72 Fed. Reg. 50580 (Aug. 31, 2007) ....................1, 4, 10
80 Fed. Reg. 43560 (July 22, 2015) ....................1, 4, 11, 17, 23, 35, 4
81 Fed. Reg. 58840 (Aug. 26, 2016) ....................43–44

**Rules**

FED. R. CIV. P. Rule 8(a)(2) ....................9
FED. R. CIV. P. Rule 12(b)(2) ....................8
FED. R. CIV. P. Rule 12(b)(3) ....................3, 49
Fed. R. Civ. P. Rule 12(b)(6) ....................7

**Other Authority**

Debt, Black's Law Dictionary (12th ed. 2024) ....................11

Debt, Merriam-Webster Dictionary
https://www.merriamwebster.com/dictionary/debt ....................11–12

Department of Defense, *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (2006) ...17

FDIC, Fin. Inst. Letter FIL-37-15, 2015 WL 5251931 (2015) ....................4, 10
*Payactiv, Inc.*, Compliance Assistance Sandbox Approval Order

(C.F.P.B. Dec. 30, 2020)
https://files.consumerfinance.gov/f/documents/cfpb_payactiv_approval-order_2020-12.pdf ....... 31

*TMX Finance LLC*,
2023 CFPBCO 0001, 2023 WL 2898364 ....... 19

## INTRODUCTION

Plaintiff Zachary Bostick is the dependent spouse of an active-duty member of the United States Navy and, as such, a "covered member" entitled to the full protections of the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA"). Compl. ¶¶ 29, 87. He obtained a TurboTax Refund Advance Loan (the "Loan") originated by Defendant First Century Bank, N.A. ("FCB") and facilitated through TurboTax and Credit Karma. *Id.* ¶ 90. The Loan proceeds were disbursed into a Credit Karma Money Spend Account provided by Defendant MVB Bank, Inc. ("MVB"). *Id.* ¶¶ 92–93. Repayment of the Loan was accomplished by intercepting Plaintiff's federal tax refund through a temporary account established by Defendant Green Dot Bank and processed by Defendant Santa Barbara Tax Products Group, LLC ("SBTPG" and together with Green Dot Bank, the "Green Dot Defendants"). *Id.* ¶¶ 95–99.

Tax refund anticipation loans are not a frontier the MLA must be stretched to reach. The Department of Defense ("DoD") named them as covered "consumer credit" in its first MLA regulation, alongside payday and vehicle title loans. 72 Fed. Reg. 50580, 50592 (Aug. 31, 2007); *see Feeman v. Bridge It, Inc.*, 826 F. Supp. 3d 505, 526 n.13 (S.D.N.Y. 2026) (refund anticipation loans "have long been understood to extend consumer credit"). The 2015 amendments broadened the rule to close the structuring loopholes creditors had used to escape it, and the Department again expressly identified refund anticipation loans among the products the amended rule reaches. 80 Fed. Reg. 43560, 43561, 43566–67 (July 22, 2015).

Defendants built the modern version of the product the rule was written for: a loan secured by the borrower's tax refund, marketed as "0% APR," with its attendant costs relocated into a required temporary deposit account, a required checking account, and the tax-preparation fees deducted from the tax refund before the borrower sees it. Their own Refund Processing Service Agreement says the quiet part in capital letters: the "LOAN SECURED BY YOUR TAX REFUND(S)." Brock Decl., Ex. E § 1.

Four separate motions to dismiss are before the Court. Intuit, Inc., Intuit TT Offerings, Inc., and CK Progress, Inc. (together, "Intuit") argue that neither Intuit nor Credit Karma is a "creditor," that the Loan carries no finance charge at all, and that Plaintiff's account-access and arbitration theories fail. ECF No. 31. MVB argues it only "provided" a "checking account," this Court lacks personal jurisdiction over it, and is the wrong venue. ECF No. 35. Green Dot Bank and SBTPG argue their role was confined to receiving, deducting, and disbursing refund proceeds after the Loan had already been made, and that none of Plaintiff's three theories reaches conduct that occurs only after origination. ECF No. 33-1. FCB argues the Loan is not "consumer credit" under the MLA at all because it carries a disclosed 0% APR and is repaid in a single installment, and separately argues that its own arbitration provision contains an express carve-out for MLA-covered borrowers. ECF No. 32 (together with ECF Nos. 31, 33-1, & 35, the "Motions"). Each of the four motions also presses, either directly or through incorporation, a "shotgun pleading" argument built around the Ninth Circuit's decision in *Gibson v. City of Portland*, 165 F.4th 1265 (9th Cir. 2026).

None of these arguments justify dismissal. The Complaint identifies, Defendant by Defendant, the specific role each entity played in a single integrated transaction. This level of particularity defeats any "shotgun-pleading" challenge on its own terms. The Loan's economic substance, not its "0% APR" label, controls whether it is MLA-covered consumer credit, and Plaintiff has plausibly alleged that multiple fees tied to that transaction are finance charges because they have "some necessary connection" to the transaction, as recognized by the Supreme Court in *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 240–41 (2004) ("*Pfennig*") (quotation and emphasis omitted).

And because a loan is subject to the MLA if it is payable in more than four installments or is subject to a finance charge, only one qualifying charge is needed to invoke the MLA. Plaintiff pleads multiple. Intuit, the Green Dot Defendants, and

MVB each plausibly qualify as creditors or otherwise MLA-liable participants based on their specific alleged functions in disbursing and collecting on the Loan, not on group pleading. Further, FCB's savings clause does not immunize the arbitration count because a second, independent arbitration agreement, contained in the Refund Processing Service Agreement, contains no such carve-out. Moreover, the savings clause fails on its own terms because the operative arbitration section of FCB's agreement excludes residents of four states by name and says nothing about covered borrowers and imposes onerous legal notice provisions that the attempted savings clause does not address or obviate for covered members. Finally, MVB's jurisdictional and venue arguments fail because MVB's own conduct, not merely Plaintiff's unilateral choices, ties it to this forum and this transaction, and importantly, a forum-selection clause cannot support dismissal under Rule 12(b)(3) at all. *Atl. Marine Constr. Co. v. U.S. Dist. Ct.*, 571 U.S. 49, 55–61 (2013).

The Motions should be denied in their entirety. In the alternative, Plaintiff requests, and should be granted, leave to amend his Complaint.

## BACKGROUND

### I. THE MILITARY LENDING ACT

The Military Lending Act was enacted in 2006 following a Department of Defense finding that predatory lending practices, heavily concentrated around military installations, undermine military readiness and harm service member retention, morale, and career advancement. Compl. ¶¶ 2, 23–26, 42–50. "Such practices endanger our nation's military readiness and are detrimental to service member retention, morale, household stability, security clearances, and career advancement." *Id.* ¶ 2. As a consumer protection statute, the MLA must be liberally construed. *See Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993) (noting TILA, which the MLA's definitions incorporate, "is liberally construed to protect consumers"). Plaintiff, the dependent spouse of an active-duty Navy servicemember, is squarely within that protected class. Compl. ¶¶ 29, 87.

MLA protections include, among other things, making it illegal for creditors to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to" service members and dependents. *See* 10 U.S.C. § 987(b). Further, "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member[.]" 10 U.S.C. § 987(f)(4).

The Department of Defense's implementing regulations have covered this product category from the start. The original 2007 rule defined "consumer credit" to include three named products: payday loans, vehicle title loans, and tax refund anticipation loans. 72 Fed. Reg. 50580, 50592 (Aug. 31, 2007); *see also* FDIC, Fin. Inst. Letter FIL-37-15, 2015 WL 5251931, at *2 (2015) (2015 rule covers refund anticipation loans and limits "rollovers, renewals or refinances" "by creditors other than banks, thrifts or credit unions."). Responding to evidence that "creditors were able to evade the law by crafting loans that fell just barely outside the parameters of the definition of 'consumer credit,'" the Department "concluded that a broad definition of 'consumer credit' was necessary…". *Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.*, 240 F. Supp. 3d 206, 220 (D.D.C. 2016); *California Pawnbrokers Ass'n v. Carter*, 2016 WL 6599819, at *4 (E.D. Cal. Nov. 7, 2016) (quoting *Huntco*); 80 Fed. Reg. 43560, 43562–63 (July 22, 2015).

Creditors may not avoid the MLA's prescriptions by structuring a transaction to avoid its requirements. If the economic substance of the transaction at issue demonstrates the transaction is MLA-covered consumer credit, the MLA may not be avoided by subterfuge. *See, e.g.*, *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 936 n.5 (N.D. Cal. 2025) (in TILA case, collecting cases and noting importance of economic substance) (cleaned up), *reconsideration denied*, 826 F. Supp. 3d 1071 (N.D. Cal. Mar. 16, 2026). Examining the substance of financial transactions over their form is not novel; for nearly a century courts have considered the substance of financial transactions and disregarded disguises and subterfuge used to avoid usury

limits. *See, e.g.*, *E.C. Warner Co. v. W. B. Foshay Co.*, 57 F.2d 656, 659 (8th Cir. 1932) ("Usury is a moral taint, and no subterfuge, however cunningly devised, will be permitted to conceal it.").

## II. THE LOAN AT ISSUE

Intuit is the nation's largest provider of online tax return preparation and electronic filing services through its TurboTax platform. Compl. ¶ 3. TurboTax markets and facilitates short-term refund-based consumer loans known as "Refund Advance" loans, allowing taxpayers to receive a portion of their anticipated federal refund shortly after filing, often the same day. *Id*. Specifically, the Loan Agreement provides that if a Loan is approved, "proceeds usually will be disbursed to your Credit Karma Money Spend Account within 2 hours after the IRS acknowledges acceptance of your tax return…". Brock Decl., Ex. B at B-2; *see also Id*. ¶ 3. Intuit markets and facilitates the Refund Advance Loan exclusively through TurboTax. *Id*. ¶¶ 3, 56. The Loan is originated by FCB. *Id*. ¶¶ 37, 90. As a condition of receiving the Loan, borrowers, including Plaintiff, must first apply and be approved for a Credit Karma Money Spend account issued by MVB. Brock Decl., Ex. B at B-1. The Loan Agreement itself provides that FCB "will not process your application unless you have applied and been approved for a Credit Karma Money Spend Account provided by MVB Bank Inc." *Id.*; *see also Id*. ¶¶ 58, 91–92. Loan proceeds are then disbursed into that account rather than delivered to the borrower without restriction. *Id*. ¶ 93.

Repayment is not a voluntary act by the borrower. Borrowers are required to authorize Green Dot Bank to establish a temporary deposit account for the sole purpose of receiving the borrower's federal tax refund, and to authorize SBTPG to deduct the Loan amount and TurboTax-related fees from that account before any remaining refund proceeds are released. Compl. ¶¶ 61–63, 96–98. To this end, the Loan Agreement takes an express security interest by stating the borrower "assign[s] to FCB [his] 2023 Tax Refund to the extent necessary to reimburse FCB for [the] Loan," grants "a security interest in the same," and "may not revoke this security

interest or any assignment." Brock Decl., Ex. B § I, B-2. The Refund Processing Service Agreement states that the Loan "IS A LOAN SECURED BY YOUR TAX REFUND(S)." Brock Decl., Ex. E § 1. That same agreement also provides that two transaction-based charges may apply to the loan's repayment. First, a $30 "Return Item Fee" and, second, a $30 "Account Research and Processing Fee." Brock Decl., Ex. E § 4; *Id*. ¶¶ 72, 99. Furthermore, the required MVB account carries its own charges, including a $2.50 fee per out-of-network ATM withdrawal. Brock Decl., Ex. D, D-16.

Although the Loan is marketed as "0% interest," the MLA's MAPR calculation includes not only stated interest, but fees and charges imposed directly or indirectly as a condition of the extension of credit. Compl. ¶¶ 12–15, 66, 100. Because Refund Advance Loans are short-term advances repaid within days or weeks of origination, even modest fixed fees can annualize into triple- or quadruple-digit effective MAPRs. *Id*. ¶¶ 74–75, 101.

Finally, Plaintiff was required, as a condition of obtaining the Loan, to electronically sign agreements containing mandatory arbitration provisions, class-action waivers, and jury-trial waivers in both the Loan Agreement itself and in other associated documents. *Id*. ¶¶ 80–84, 102–106.

## III. PLAINTIFF ZACHARY BOSTICK

Zachary Bostick is a California resident and the dependent spouse of an active-duty member of the United States Navy, and is therefore a "Covered Borrower" entitled to the full protections of the MLA. *Id*. ¶¶ 29, 87. In the 2024 tax filing season (for filing 2023 returns), he used TurboTax to prepare and electronically file his federal income tax return and, in that process, applied for and obtained the Loan from FCB. *Id*. ¶¶ 88–90. As alleged in detail below, obtaining and repaying that Loan required him to open an MVB-issued account, route his refund through a Green Dot Bank temporary account, and sign multiple arbitration agreements, the very structure

the MLA's finance-charge, creditor, account-access, and arbitration provisions were designed to reach.

**LEGAL STANDARD**

To withstand a Rule 12(b)(6) motion, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in Plaintiff's favor. *See Iqbal*, 556 U.S. at 678–79. Although extrinsic documents submitted with a motion to dismiss may be considered when they are incorporated by reference in the complaint, where the documents contradict the complaint's allegations, the complaint controls at the pleading stage. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1014 (9th Cir. 2018) ("Defendants face an alluring temptation to pile on numerous documents to their motions to dismiss to undermine the complaint . . ."). Further, courts "will not consider these documents for the truth of the matters asserted therein." *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010).

Those limits matter here because Defendants' motions rest on evidence. Intuit filed two declarations and seven exhibits, including an "example" checkout screen that Plaintiff never saw (Brock Decl., Ex. A), a version of the MVB account terms dated as of March 6, 2026, two years after Plaintiff's transaction (Brock Decl., Ex. D), and a 2004 minute order from other litigation (Brock Decl., Ex. G). *Khoja* forbids using incorporation by reference "only to resolve factual disputes against the plaintiff's well-pled allegations," 899 F.3d at 1014, and courts applying *Khoja*'s holding have refused to consider a defendant's own records of a plaintiff's transactions on a Rule 12 motion because such records "present questions of fact, both with respect to what they denote and whether they accurately reflect" the plaintiff's experience. *Orubo v. Activehours, Inc.*, 826 F. Supp. 3d 1071, 1075 (N.D. Cal. 2026); *accord Ramirez v. Activehours, Inc.*, 828 F. Supp. 3d 1040, 1045 n.4

(N.D. Cal. Mar. 25, 2026) (contested transaction records "cannot be considered on a Rule 12(b)(6) motion"). Plaintiff objects to the attempted use of extraneous documents for the truth of factual assertions contrary to the Complaint and he specifically asks the Court to disregard them.

Regarding standing, Intuit's, FCB's, and the Green Dot Defendants' standing arguments are facial attacks. None submitted evidence contesting subject-matter jurisdictional facts, and each argues against standing only based on the pleadings. The Court therefore must accept Plaintiff's allegations as true and draw all reasonable inferences in Plaintiff's favor.

Finally, when personal jurisdiction is challenged under Rule 12(b)(2), Plaintiff bears the burden of making a prima facie showing of personal jurisdiction, and the Court must resolve factual conflicts in Plaintiff's favor. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

## ARGUMENT

### I. THE COMPLAINT'S DEFENDANT-SPECIFIC ALLEGATIONS DEFEAT THE SHOTGUN-PLEADING CHALLENGE

All four motions lead with the argument that the Complaint impermissibly "lumps" the Defendants together. That argument does not survive a fair reading of the Complaint.

A shotgun pleading is one that asserts claims against multiple defendants "without specifying which of the defendants are responsible for which acts or omissions." *Gibson*, 165 F.4th at 1287–88. The Complaint here does the opposite by identifying:

- FCB as the entity that originates and funds the Loan, Compl. ¶¶ 37, 90;
- Intuit as the operator of the TurboTax platform through which the Loan is marketed and offered, Compl. ¶¶ 3, 30, 56, 88–89;
- Credit Karma as the program partner for the branded account through which proceeds are delivered, Compl. ¶¶ 35, 59, 94;

- MVB as the issuer of the Credit Karma Money Spend account, Compl. ¶¶ 36, 58, 91, 93;
- Green Dot Bank as the entity that establishes the temporary deposit account for refund interception, Compl. ¶¶ 38, 61, 69, 96; and
- SBTPG as the entity that processes the refund interception and deducts Loan repayment and fees, Compl. ¶¶ 38, 62–63, 70–72, 97–99.

That role-specific pleading gives each defendant fair notice of what it is alleged to have done, which is all Rule 8 requires.

Ninth Circuit precedent is clear, "[t]here is no flaw in a pleading . . . where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016); *Mikulsky v. Bloomingdale's, LLC*, 713 F. Supp. 3d 833, 843 (S.D. Cal. 2024). The Complaint collectively references Defendants when they engage in jointly-performed conduct, such as the design and marketing of the loan program, and specifies the role each Defendant played in the joint conduct. Moreover, the Complaint alleges joint and several liability, a recognized legal theory, not a pleading deficiency. *Compare* Compl. ¶¶ 3, 5, 7, 27–28, 30–39, 56–59, 61–64, 69–72, 85, 90–92, 96–98, 103–104 *with Adobe Sys. Inc. v. Blue Source Grp., Inc.*, 125 F. Supp. 3d 945, 964 (N.D. Cal. 2015) (pleading against "Defendants" "does not mean that a plaintiff's assertion of claims against 'Defendants' will automatically be deficient" and "[p]ut another way, a plaintiff's allegations must 'provide sufficient notice to all of the Defendants as to the nature of the claims being asserted against them'") (citations omitted). Basic notions of federal notice pleading, including Rule 8(a)(2), *Twombly*, and *Iqbal*, require only sufficient factual matter to state a plausible claim. The Complaint meets that standard by setting forth allegations paragraph-by-paragraph and defendant-by-defendant where appropriate. Defendants' shotgun-pleading argument requires one

to divorce the collective pleading allegations from the specific conduct allegations and is not an accurate characterization of Plaintiff's Complaint.

MVB separately argues that its own jurisdictional allegation, namely that "Defendants" generally conduct business in California, is itself impermissible group pleading. For the reasons stated here, and because MVB is properly before the Court, that argument must also fail.

## II. THE REFUND ADVANCE LOAN CONSTITUTES "CONSUMER CREDIT" SUBJECT TO A FINANCE CHARGE

Intuit's and FCB's motions, joined in substance by others, argue the MLA does not apply to the Loan at all because it carries a disclosed 0.0% APR and is repaid in a single installment. ECF No. 31 at 13–14; ECF No. 32 at 7–8; ECF No. 33-1 at 5; ECF No. 35 at 4–5. That argument conflates the Loan's own fee-free label with the fee-inclusive, transaction-wide inquiry the MLA actually requires, and, as explained herein, cannot be resolved on the pleadings.

### A. Refund Anticipation Loans Are a Named Category of MLA Consumer Credit.

The Department of Defense left neither refund advance products, nor the Loan's status to inference. Instead, the original 2007 regulation defined covered "consumer credit" to include "tax refund anticipation loans" by name. 72 Fed. Reg. 50580, 50592 (Aug. 31, 2007). When the Department broadened the rule in 2015, the FDIC advised its supervised banks that the amended rule reaches refund anticipation loans and nonbank creditors alike. FDIC, Fin. Inst. Letter FIL-37-15 (2015). Courts describe the category the same way. *Feeman*, 826 F. Supp. 3d at 526 n.13 (refund anticipation loans advance funds "in exchange for the right to collect a payment from the government in the amount of a taxpayer's anticipated tax refund" and "have long been understood to extend consumer credit"); *see also Davis v. Pacific Capital Bank, N.A.*, 550 F.3d 915 (9th Cir. 2008) (applying TILA to the flat finance charge on a refund anticipation loan).

The Refund Advance at issue here is a refund anticipation loan with new clothes. FCB advances a portion of the expected refund, takes an irrevocable assignment of and security interest in the refund, and collects when the Treasury pays. Brock Decl., Ex. B §§ C, I; Ex. E §§ 1, 4. Defendants ask the Court to hold that a founding example of MLA consumer credit now escapes the statute because its costs now travel through required side accounts rather than a stated interest rate. The 2015 amendments were adopted to stop exactly this attempted subterfuge, and those amendments specifically name refund anticipation loans among the covered products. 80 Fed. Reg. at 43562, 43567.

**B. The Loan Is "Credit." Plaintiff Incurred Debt and Deferred Its Payment.**

The Loan falls squarely within the MLA's definition of consumer credit. Starting with the statutory text, the MLA applies to the "extension of consumer credit" to "covered members" and their dependents. 10 U.S.C. § 987(a). The MLA adopts the definition of consumer credit "provided ... in regulations" by the Department of Defense. *Id.* § 987(i)(6). Those regulations define "consumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) subject to a finance charge; or (ii) payable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1). In turn, "credit" is defined as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). This definition is substantially similar to the "credit" definition provided under the TILA, which comes as no surprise considering the "MLA incorporates TILA's definition of 'consumer credit….'" *Moss v. Cleo AI Inc.*, 799 F. Supp. 3d 1152, 1158 (W.D. Wash. 2025) (quoting 10 U.S.C. § 987(i)(6)); and *compare* 32 C.F.R. § 232.3(h) *with* 15 U.S.C. § 1602(f). Finally, Black's Law Dictionary defines "debt" as a "[l]iability on a claim; a specific sum of money due by agreement or otherwise…" while Merriam-Webster defines it as "something owed; obligation," or "a state of being under

obligation to pay or repay someone or something in return for something received; a state of owing." *See* DEBT, (12th ed. 2024); https://www.merriamwebster.com/dictionary/debt, respectively.

The Loan allowed Plaintiff to incur debt and defer its payment, thereby constituting consumer credit. *See* 32 C.F.R. § 232.3(h). Defendants advanced Plaintiff, the borrower, a portion of his anticipated federal tax refund, with repayment to be made from the refund once received. Compl. ¶¶ 3–5, 7, 56–59, 61–64. Loan repayment was accomplished through Plaintiff's authorization for Green Dot Bank and SBTPG to intercept his tax refund, deposit it into a temporary deposit account, deduct the amount due on the loan, and transfer that amount to the originating lender. *Id.* ¶¶ 61–64, 90–98. The Refund Advance Loan Agreement (Brock Decl., Ex. B) made clear that Plaintiff was obligated to repay the advance upon receipt of his refund, and Refund Processing Service Agreement (Brock Decl., Ex. E) detailed the procedure and authorization for repayment, including listing finance charges incident to the extension of credit. *Id.* ¶¶ 9–10, 67–68, 72–73, 100, 159.

This conclusion is reinforced by the recent decision in *Revell v. Grant Money, LLC*, 808 F. Supp. 3d 1036 (N.D. Cal. 2025). There, the defendant argued that its earned-wage-advance product was not "credit" because the customer agreement disclaimed any "legal or contractual claim" against a customer who failed to repay, meaning the customer had no enforceable "obligation to repay." *Id.* at 1049. The *Revell* court rejected that defendant's argument, holding a creditor's decision to forgo legal recourse does not eliminate the customer's practical obligation to repay, particularly where repayment is secured through mandatory, pre-authorized debits from a linked account. *Id.* at 1049–50. Instead, as the court explained, reading the MLA's definition of "credit" as requiring an enforceable legal obligation, as opposed to a functional, transactional one, would let creditors evade the statute's consumer-protection purpose by contract drafting alone. *Id.* at 1050–51. (also noting that

because the MLA was designed to protect borrowers from predatory lending and stating, "the statutory text must be read broadly").

The same logic should control here. Whatever formal characterization Defendants may wish to give the Loan, Plaintiff's repayment was secured through mandatory interception of his refund via the Green Dot deposit account and SBTPG's deduction mechanism, the same kind of practical, transactional repayment obligation the *Revell* court found sufficient to constitute "credit," regardless of whether any particular recourse mechanism was disclaimed. Compl. ¶¶ 61–63, 90, 95, 97–98; *and see Orubo*, 780 F. Supp. 3d at 935 (advances in exchange for authorization to intercept and debit incoming funds are the "precise type of deferred presentment scheme Regulation Z characterizes as credit").

Moreover, these cases are consistent with the FRB's official staff commentary, issued in response to a novel-at-the-time wave of "payday loans" including "cash advance," "payday advance," and so-called "deferred presentment" transactions. 65 Fed. Reg. 17129. In a deferred presentment transaction, the borrower writes the lender a check for a principal amount and service fee, the lender advances the principal in cash immediately, and the borrower agrees that after a set period, she will repay the principal and fee or roll the loan over by paying the fee and writing a new check. *Turner v. E-Z Check Cashing, Inc.*, 35 F. Supp. 2d 1042, 1045 (M.D. Tenn. 1999). Courts considering these transactions have uniformly held that deferred presentment transactions are extensions of credit under TILA. *See, e.g., Id.* at 1047; *Hamilton v. York*, 987 F. Supp. 953 (E.D. Ky. 1997); *Arrington v. Colleen, Inc.*, 2001 WL 34117735, at *2–*3 (D. Md. Mar. 29, 2001) (collecting cases).

**C. Any Single-Installment Argument Fails.**

The MLA applies to credit that meets its definition of "consumer credit," meaning that the extension of credit is *either* "subject to a finance charge" *or* "payable by written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1). The two prongs are independent.

Even if the Loan is repaid in a single installment that has no bearing on whether the extension of credit is consumer credit under the MLA. If any one of the fees qualifies as a "finance charge" (preview: they do), the first prong is satisfied and the MLA applies regardless of the disclosed 0.0% stated APR, which reflects only interest and says nothing about the MAPR's broader, fee-inclusive measure. *See generally Pfennig*, 541 U.S. at 240–41 (discussion of "necessary connection" in determining finance charge); *Russell v. Dave Inc.*, 812 F. Supp. 3d 998, 1008–11 (C.D. Cal. 2025); and *Ramirez*, 828 F. Supp. 3d at 1047–51 (both involving products marketed as fee-light or interest-free "advances," both citing *Pfennig*, and both allowing finance-charge question to move past the pleading stage); *accord Moss v. Klover Holdings, Inc.*, 2026 WL 622653, at *7 (N.D. Ill. Mar. 5, 2026) (adopting "the construction of the TILA and MLA that every federal district court has given those statutes" in advance-product cases).

**D. Whether the Loan Is Subject to a Finance Charge Is a Merits Question That Should Not Be Resolved Against Plaintiff on the Pleadings.**

The MAPR calculation is broader than TILA's APR and is designed to capture the true cost of credit, including fees that do not appear on the face of the loan document. Courts in analogous "earned wage access" cases have resolved finance-charge questions in the plaintiff's favor. *See Russell*, 812 F. Supp. 3d at 1008–11; *Ramirez*, 828 F. Supp. 3d at 1046–51; *Revell*, 808 F. Supp. 3d at 1051–52 (finding the defendants "have not shown" that expedite fees are "of a type payable in a comparable cash transaction") (citation omitted).

A charge qualifies when it bears a "necessary connection" to the credit, and a charge that "exists only because the loan exists" does indeed bear such a connection. *Feeman*, 826 F. Supp. 3d at 529; *see also Lowe v. MoneyLion Techs. Inc.*, 822 F. Supp. 3d 374, 380 (S.D.N.Y. 2026) (imposition of "Turbo fees and tips" brought loan product "Instacash" within "the disclosure requirements of the MLA and TILA, as well as the substantive requirements of the MLA"). Each fee the Complaint identifies

exists because Plaintiff took the Loan: the account fees attach to an account he had to open to receive proceeds, and the processing fees attach to an account that exists for no purpose except repaying FCB. Compl. ¶¶ 10–11, 62, 70–73, 98–100, 157–58.

The TurboTax refund-loan pairing itself has a documented history of alleged excessive finance charges. In *Quildon v. Intuit, Inc.*, consumers who prepared tax returns through Intuit's TurboTax software and elected a refund-based loan alleged undisclosed finance charges producing effective APRs exceeding 100%. 2012 WL 1902021, at *1 (N.D. Cal. May 25, 2012) (remanding matter to state court and denying motion to dismiss as moot).

The growing line of MLA (and TILA) cases makes clear that a fee does not have to be mandatory to qualify as a finance charge. Courts consistently hold that a charge need only have a sufficient "connection" to the extension of credit – not be strictly required. *Russell*, 812 F. Supp. 3d at 1008 ("[a] charge need not be mandatory to be 'incident to the extension of credit'") (citation omitted); *Revell*, 808 F. Supp. 3d at 1051–52; *Ramirez*, 828 F. Supp. 3d at 1048–50. Because the TurboTax preparation fee, MVB account fees, and processing fees were all imposed in connection with a transaction that began and ended with the Loan, their relationship to the Loan is a factual question for discovery, not dismissal. This is especially true considering the Complaint alleges specifically that each fee was imposed "incident to and as a practical condition of receiving the Refund Advance Loan," (Compl. ¶¶ 10, 65–68, 73), that the account structure is "inseparable" from the Loan (*id.* ¶¶ 3, 57, 67), and that "[t]his required account is not optional or incidental; it is a condition of obtaining the loan" (*id.* ¶ 65). These particularized allegations satisfy the necessary connection to plausibly be "incident to" "the extension of credit."

Defendants' insistence that only mandatory charges can be finance charges is also irreconcilable with the text of the definition itself. The MLA's definition of a "finance charge" reaches any charge imposed "as an incident to *or* a condition of the extension of credit." 12 C.F.R. § 1026.4(a) (emphasis added). The disjunctive "or"

signals that the two clauses "are to be given separate meanings," so a charge that is merely incident to credit qualifies even if it is not a condition of credit. *Loughrin v. United States*, 573 U.S. 351, 357 (2014) (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)). Reading the definition to require that every finance charge be a mandatory charge would collapse the two clauses together and render the words "incident to" mere surplusage – a construction courts must avoid. *See United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003). At a minimum, the preparation, account, and processing fees alleged here were "incident to" the Loan because Plaintiff incurred them as part of the transaction through which he obtained the Loan. Such a relationship brings the fees within the definition of a finance charge, regardless of whether any individual fee was independently mandatory. Compl. ¶¶ 11, 67, 72–74, 78.

Because the MLA applies once the credit is "subject to a finance charge," the Court need not resolve the status of every fee individually. 32 C.F.R. § 232.3(f)(1)(i). So long as a single charge qualifies, the entire credit product – and every dispute arising from it, including the arbitration bar – is subject to the MLA. 10 U.S.C. § 987(f)(4). The Complaint identifies multiple charges tied to the Loan, the Tax Product and TurboTax preparation fees, the Credit Karma account fees, and the $30 Return Item and $30 Account Research and Processing Fees. Compl. ¶¶ 71–72, 98–99. Plaintiff has met his burden (and then some) at the pleading stage.

**E. The MLA Must Be Construed Broadly to Effectuate Its Protective Purpose.**

Reading the MLA to exclude post-consummation fees as categorically barred from being considered finances charges "would allow creditors to skirt the consumer protection functions of the statute and read a limitation into the statute that does not exist." *Ramirez*, 828 F. Supp. 3d at 1052 (cleaned up) (quoting *Revell*, 808 F. Supp. 3d at 1050). Defendants' attempt to limit the MAPR to fees disclosed in the Loan Agreement is precisely the type of formalistic evasion Congress sought to prevent.

The DoD's 2006 Report specifically called out lenders that "attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or developing schemes designed to circumvent existing laws" and that "obfuscate the comparative cost of their product" through complex fee structures. *See* Dep't of Def., *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (2006). That same concern drove the DoD's 2015 expansion of MLA coverage: the rulemaking record reflects that United States Senators "urged the Department to widely expand the definition of 'consumer credit' to close the 'existing MLA loopholes'" and "asserted that creditors were able to evade the law by crafting loans that fell just barely outside the parameters of the definition of 'consumer credit.'" *California Pawnbrokers Ass'n*, 2016 WL 6599819, at *4 (quoting 2015 Rule, 80 Fed. Reg. 43560, 43562).

The TurboTax Refund Advance Loan – marketed as "0% APR" while embedding finance charges in a Credit Karma account, a Green Dot temporary deposit account, and an SBTPG refund interception process – is precisely the kind of structuring the expanded MLA was designed to reach. *See, e.g., Revell*, 808 F. Supp. 3d at 1051–52 (holding that a non-recourse EWA product was "credit," and that non-mandatory expedite fees were "finance charges," making the product MLA "consumer credit" notwithstanding its structuring).

Similarly, Defendants cannot defeat the MLA's application through the "0% APR" label affixed to the Loan. When assessing whether a transaction is covered consumer credit or whether a charge is a finance charge, the court must look "past the form of the transactions to their economic substance" rather than the labels the lender selects. *See Orubo*, 780 F. Supp. 3d at 936 n.5 (collecting cases). Courts have applied that rule to usurious lending for nearly a century, recognizing that "[u]sury is a moral taint, and no subterfuge, however cunningly devised, will be permitted to conceal it." *E.C. Warner Co.*, 57 F.2d at 659. Here, the economic substance is unmistakable: Defendants advanced Plaintiff a portion of his tax refund, deferred

repayment until the refund arrived, made him pre-authorize fees, and repayment and fees through the required account in line with their refund-interception infrastructure. Compl. ¶¶ 6–10, 14–15, 72–74, 78, 98–100, 158–159. The "0% APR" label cannot conceal that reality, and, in any event, conflicts with the pleadings.

Independently, even if a particular charge fell outside Regulation Z's general finance charge definition, it would still count toward the MAPR under the MLA's far broader definition of "interest." The MLA provides that "interest" "includes all cost elements associated with the extension of credit, including fees, service charges, renewal charges, credit insurance premiums, any ancillary product sold with any extension of credit to a servicemember or the servicemember's dependent, as applicable, and any other charge or premium with respect to the extension of consumer credit." 10 U.S.C. § 987(i)(3). That definition controls even where it sweeps more broadly than the ordinary meaning of interest or other legal definitions. *Cf. Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018) ("'When a statute includes an explicit definition, we must follow that definition,' even if it varies from a term's ordinary meaning. (quoting *Burgess v. United States*, 553 U.S. 124, 130, (2008)).

All that matters is that a charge be a "cost element" "associated with the extension of credit." 10 U.S.C. § 987(i)(3). The TurboTax preparation fees, the Credit Karma account fees, and the refund-processing fees are each cost elements associated with obtaining and repaying the Loan, and so are captured by § 987(i)(3) independent of any Regulation Z analysis. *See generally CFPB v. MoneyLion Techs. Inc.*, 799 F. Supp. 3d 152, 174 (S.D.N.Y. 2025) ("Taking a step back, there is nothing particularly surprising about the fact that the cost elements included in the MAPR calculation would be more expansive than those included under TILA and Regulation Z. **The entire reason that Congress enacted the MLA in the first place was to provide an enhanced package of financial protections to military borrowers that are not**

**available to consumers more broadly.**") (emphasis added). Plaintiff plausibly pleads these cost elements. Compl. ¶¶ 9–11, 62, 66–68, 70–73, 97–100.

## III. EACH DEFENDANT QUALIFIES AS A "CREDITOR" OR MLA-LIABLE PARTICIPANT

### A. Intuit and Credit Karma Have Functional Control Over the Transaction.

Intuit argues they are not "creditors" because FCB alone signed the Loan Agreement, pointing to out-of-circuit TILA decisions holding that an entity is not a creditor if it did not itself loan money. ECF No. 31 at 11–13. This form-over-substance reading is inconsistent with how courts analyze creditor status under the MLA and TILA.

The MLA's implementing regulations define a "creditor" as a person "[e]ngaged in the business of extending consumer credit" or "[a]n assignee of" such a person "with respect to any consumer credit extended." 32 C.F.R. § 232.3(i)(1)–(2); *accord* 10 U.S.C. § 987(i)(5). A person is "engaged in the business" if, together with its affiliates, it meets the Regulation Z transaction standard as to covered borrowers. 32 C.F.R. § 232.3(i)(3). The CFPB has applied both tracks, charging an entity as originator and as assignee in the same order. *TMX Finance LLC*, 2023 CFPBCO 0001, 2023 WL 2898364.

The Complaint's specific allegations, not Defendants' signature-page argument, control that inquiry. The Loan does not exist as a product independent of TurboTax. Instead, Defendants "market and facilitate" the Loan through the TurboTax platform, and a borrower cannot apply for, obtain, or receive the Loan except by first using TurboTax to prepare her tax return, and then agreeing to use co-Defendant products or services. Compl. ¶¶ 3, 56–57, 88–91. Intuit (and Credit Karma) is no mere bystander to the disbursement, either. The Loan Agreement itself provides that the Credit Karma Money Spend Account is "offered on behalf of" Credit Karma as "MVB Banks Inc.'s program partner," (Brock Decl., Ex. B) and

Loan proceeds are disbursed into that Credit Karma-branded account rather than delivered to Plaintiff directly. Compl. ¶¶ 93–94. FCB also relies on data collected through Intuit and Credit Karma to underwrite: the Loan Agreement states that information supplied "in connection with your application for your Credit Karma Money Spend Account" is information "FCB will rely on . . . in making a credit decision." Brock Decl., Ex. B § F. Intuit's argument that they merely "refer" customers to FCB is contradicted by the very allegations Defendants ask the Court to credit, namely, a borrower cannot reach FCB's Loan except through Intuit's platform and cannot receive FCB's loan proceeds except through a Credit Karma-branded account that Credit Karma (which is owned by Intuit) itself is a named party to operating. Compl. ¶¶ 3, 56, 59, 88–89, 93–94.

*People v. JTH Tax, Inc.* addressed this structure directly. 212 Cal. App. 4th 1219 (2013). There, a tax preparer's customers paid a "handling fee" for the *lender bank's* establishment of a temporary, special-purpose account to receive their refunds directly from the IRS, out of which the bank deducted preparation fees, the handling fee, and other charges. *Id.* at 1224–25. The Court of Appeal held the fee was an undisclosed TILA finance charge notwithstanding that the preparer did not originate the credit and the fee was collected by the bank, because the fee "was a condition to customers receiving Liberty's tax services on credit" and because "[t]he details of the manner in which the charge is imposed are irrelevant." *Id.* at 1228, 1231 (quoting *Berryhill v. Rich Plan of Pensacola*, 578 F.2d 1092, 1099 (5th Cir. 1978)). It rejected the argument that a fee escapes finance-charge treatment because it does not vary with the length of the credit and rejected the comparable-cash defense. *Id.* at 1229, 1231–32. Whether Intuit (and Credit Karma) occupies a role as intertwined as Liberty's – including whatever payment terms or potential revenue-sharing deals underpin inter-Defendant agreements, a subject in Defendants' exclusive possession – is a question the Court cannot resolve against Plaintiff on the pleadings. *Khoja*, 899 F.3d at 998, 1014.

The *Wojcik*, *Ridha*, and *Zawikoski* decisions Intuit cites involved entities with no comparable gatekeeping role, and all three are TILA cases decided years before the 2015 MLA rule extended coverage to nonbank participants. *See Wojcik v. Courtesy Auto Sales, Inc.*, 2002 WL 31663298 (D. Neb. Nov. 25, 2002), *Ridha v. Mortg. Elec. Registration Sys., Inc.*, 2010 WL 4867416 (E.D. Mich. Nov. 23, 2010), *Zawikoski v. Beneficial*, No. 1:98-cv-02178, Dkt. 934 (N.D. Ill. Feb. 27, 2004), respectively. *Zawikoski* is an unpublished 2004 minute order.

Whether a program participant is "engaged in the business of extending consumer credit" is the same inquiry courts and regulators run under the true-lender rubric, and it is factual. Just two months ago, a California court resolved which entity in a bank-partner program was "the entity actually extending credit" only on a summary-judgment record, examining who controlled the application process and underwriting, who funded the loan and retained ownership, who bore the financial risk, who controlled marketing, and who oversaw compliance. *Opportunity Fin., LLC v. Hewlett*, No. 22STCV08163, Statement of Decision at 16 (Cal. Super. Ct. May 19, 2026); *accord* Colo. Att'y Gen., Assurance of Discontinuance, *In re Avant of Colo., LLC & Marlette Funding, LLC* (Aug. 2020) (bank-partner programs comply only where the bank retains ultimate approval authority over origination, marketing, program content, and credit terms). None of those facts is before the Court. The pleadings do not establish who controls TurboTax's application flow and underwriting data, who bears the risk associated with the Refund Advance portfolio, or how the program's revenue is divided. Defendants' own agreements, however, assign the customer-facing functions to Intuit and Credit Karma. The Court should not wade into pleading-stage factfinding.

Moreover, Regulation Z expressly contemplates transactions that involve multiple creditors. *See* 12 C.F.R. § 1026.17(d) (in multi-creditor transactions, one set of disclosures can be given as long as certain conditions are met). The MLA further defines "creditor" to include an "assignee of" the lender "with respect to any

consumer credit extended." 10 U.S.C. § 987(i)(5)(B); 32 C.F.R. § 232.3(i)(2). The MLA contains no comparable limitation on assignee liability, whereas TILA generally permits an action against an assignee only when the violation is apparent on the face of the disclosure statement. 15 U.S.C. § 1641(a).[1]

Independently, the MLA's civil-liability provision reaches "[a] person who violates this section," language that is broader than the MLA's criminal provision which is limited to a creditor who "knowingly violates" the statute. 10 U.S.C. §§ 987(f)(5)(A) & 987(f)(1). This liability framework is also broader than TILA's creditor-limited civil remedy. 15 U.S.C. § 1640(a).

Intuit (and Credit Karma) participates in the multi-account structure that features arbitration agreements forbidden by the MLA. This also independently supports treating them as "person[s] who violate[]" the MLA on those counts regardless of their creditor status for the fee-based counts. Compl. ¶¶ 80–81, 91–94. The Loan Agreement confirms the point. Section R defines "FCB" to include "its service providers in connection with the Loan program," writing co-Defendants in as beneficiaries entitled to invoke the arbitration and class-waiver provisions the MLA forbids. Brock Decl., Ex. B § R. The Credit Karma Money Spend Account Terms & Disclosures lists "CK Progress, Inc." among the "'we,' 'our,' and 'us'" to that contract, which also includes an arbitration provision. Brock Decl., Ex. C §§ I, X. Entities that designate themselves parties to the prohibited terms are, at the least, plausibly persons who violate the MLA.

In sum, Intuit is a proper party to this action, and as such, its motion must be denied.

---

[1] While not included in the Complaint, Plaintiff concurrently files a Request for Judicial Notice relating to Form 10-K documents filed by Intuit with the Securities and Exchange Commission. Notably, when discussing "Refund Advance Loans," Intuit states "We partner with a third-party issuing bank to originate the loans and subsequently purchase full participating interests in those loans." Wise Decl., Ex. 1 at 081; Ex. 2 at 077. In the event the Court does not want to consider materials outside the Complaint, Plaintiff requests leave to file an amended complaint.

**B. MVB Bank's Role Is Integral to the Delivery of Loan Proceeds.**

MVB characterizes its role as merely "providing" a checking account, i.e., the same characterization an ordinary, unrelated bank could offer about any consumer's independently-opened account. But the Complaint alleges a materially different arrangement, and at the pleading stage those allegations, not MVB's preferred label, control.

Plaintiff did not walk into MVB and open an account of his own initiative; he could not obtain the Loan unless he "first applied for and was approved for" the MVB-issued Credit Karma Money Spend account. Compl. ¶ 91. The Loan Agreement itself makes MVB's approval a gating condition as FCB "will not process" the application without it. *Id.* ¶ 92. Once approved, the Loan proceeds were not delivered directly to Plaintiff without restriction. They were instead "disbursed into Plaintiff's Credit Karma Money Spend Account." *Id.* ¶ 93. That account was thus not an independent banking relationship incidentally used to hold Loan funds, it was instead manufactured as, and functioned as, the delivery route for the credit itself, and was the same account through which any out-of-network ATM fees would later be imposed. *Id.* ¶¶ 58, 76–77; Brock Decl., Ex. C at C-16.

The DoD swept exactly this arrangement into MAPR. Fees a consumer must pay to access the credit count, whatever the label, because "the financial institution's own apportioning of revenue among the various 'fees' and 'interest' does not change the key fact that it is all part of an aggregate bundle of costs associated with the extension of credit." *CFPB v. MoneyLion Techs. Inc.*, 799 F. Supp. 3d 152, 178 (S.D.N.Y. 2025) (quoting 80 Fed. Reg. 43569 and finding "[t]his rationale closely tracks one of the Department of Defense's requests for the MLA itself, which was to 'include *all* cost elements associated with the extension of credit…'" (quoting DoD Report at 7)). MVB's own account-approval requirement was an absolute prerequisite – Plaintiff could not receive a single dollar of credit without it. Compl. ¶¶ 91–92. Whether the account was a pre-existing, freely-chosen relationship or a

required, MVB-approved component of the Loan product (as the Complaint alleges) is, at minimum, a factual dispute that cannot be resolved against Plaintiff on a motion to dismiss. Compl. ¶¶ 58, 76–77, 91. *See Khoja*, 899 F.3d at 998, 1014.

MVB also argues, in a single conclusory paragraph, that even if it were a creditor, the standard out-of-network ATM fees Plaintiff "chose to pay" cannot support an MLA claim. ECF No. 35 at 6. That argument is addressed together with the comparable-cash-transaction analysis in § IV.C, *infra*.

### C. Green Dot Bank and SBTPG Exercise Functional Control Over the Repayment Mechanism.

Green Dot and SBTPG argue they are not MLA "creditors" because they did not formally originate the Loan and separately argue that their role is confined to the "receipt, deduction, and disbursement of tax-refund proceeds after the Loan had already been originated – i.e., after the consumer credit had already been extended," such that their conduct cannot be assessed under the MLA at all. ECF No. 33-1 at 9, 14.

The Green Dot Defendants cite *Ramirez*, but that case found the Defendant was a creditor under TILA and the MLA. *Id.* at 9. These Defendants press the proposition that "entities are not creditors if they did not originate or extend the loan at issue." *Id.* However, *Ramirez* found the defendant there was a creditor and denied the defendant's motion to dismiss in full. 828 F. Supp. 3d at 1052–54. *Ramirez* found "plaintiffs adequately plead that Earnin's tips and its Lightning Speed fees" are finance charges, and as such, at the pleading stage, "Earnin is therefore a creditor under TILA." *Id.* at 1051. *Ramirez* continues by holding the plaintiffs adequately pleaded their MLA claims. *Id.* at 1052–54. Most notably, *Ramirez* involved a single defendant that both originated the advances and imposed the fees; the court had no occasion to address, and did not address, the creditor status of a non-originating participant when denying, in full, the motion to dismiss. *See generally id.* at 1043–54.

Plaintiff does not allege that Green Dot or SBTPG underwrote or funded the Loan. He alleges that they acted as part of the whole; they operated the mechanism designed to ensure repayment. The Complaint describes that role in detail and alleges conduct that went far beyond passive custody. Green Dot was "required" to be authorized to "establish a temporary deposit account for the sole purpose of receiving" Plaintiff's refund, an account with no function other than repaying this Loan. Compl. ¶ 96. SBTPG was then authorized to "deduct from this temporary deposit account not only the amount of the Refund Advance Loan, but also TurboTax-related fees and other charges, before any remaining refund proceeds were disbursed to Plaintiff," as well as fees for additional products. *Id*. ¶¶ 97–99. Once Plaintiff's return was filed, he had no ability to redirect that refund, cancel the interception, or otherwise prevent SBTPG from collecting what it determined FCB and the other Defendants were owed. *Id*. ¶¶ 62–65, 95–99. The Complaint characterizes this arrangement directly, stating it "constitutes an unlawful method of using access to a deposit account and federal tax refund proceeds as security for the obligation." *Id*. ¶ 64.

Next, the Green Dot Defendants argue their conduct necessarily falls outside the MLA because it occurs after credit is disbursed or has "already been extended." ECF No. 33-1 at 9. The MLA's account-access provision, by its own terms, controls the security a creditor takes for an already-extended obligation. 10 U.S.C. § 987(e)(5). A security-for-repayment theory is, definitionally, about post-origination conduct.

The Green Dot Defendants designed and controlled the only mechanism that collects the Loan, intercepting the pledged refund before the borrower receives it. Their role begins after disbursement, but that does not make them passive conduits. The Court cannot resolve questions of fact on the pleadings, including whether entities, like the Green Dot Defendants, that intercept and control a loan's repayment source qualify as creditors or assignees under 32 C.F.R. § 232.3(i)(1)–(2).

The assignee track also deserves attention. The Loan Agreement authorizes FCB to "assign, sell or transfer this Agreement, our security interest, [and] our ownership of any Loan," while SBTPG collects the receivable and remits "the amount due on the Loan directly to the originating lender." Brock Decl., Ex. B § J; Compl. ¶¶ 63, 140, respectively. Who holds the receivable while the refund sits in the Green Dot account is a program-agreement question suitable for resolution after Plaintiff has been allowed to conduct discovery, not before.

Moreover, Plaintiff's allegation that FCB formally originated the Loan is a description of the transaction's structure, not a judicial admission that the Green Dot Defendants bear no MLA liability for their own, separately alleged conduct in operating the repayment mechanism. Compl. ¶¶ 61–65, 90, 96–99. Further, the Green Dot Defendants are not unrelated third parties to one another. Plaintiff alleges SBTPG is "a division of Green Dot Corporation." *Id.* ¶ 38. That common corporate relationship cuts against treating either entity's role as an incidental, arms-length service unconnected to the Loan's design. Nor does that allegation, as the Green Dot Defendant's motion suggests, foreclose amendment as futile. A judicial admission binds a party only as to the fact actually admitted (like FCB originated the Loan) but does not as to separate legal questions (like whether the Green Dot Defendant's own conduct independently triggers MLA liability).

Finally, the Green Dot Defendants' structural argument from 10 U.S.C. § 987(e)(1) fares no better. That subsection restricts rollovers "by the same creditor" presupposing that creditor status attaches transaction by transaction. Notably, § 987(e)(1) says nothing about whether more than one entity can be a creditor, or assignee, as to a single extension of credit. Regulation Z contemplates multi-creditor transactions, and the MLA's assignee prong exists for participants who acquire the credit after origination. 12 C.F.R. § 1026.17(d); 10 U.S.C. § 987(i)(5)(B).

## IV. FEES AND CHARGES WERE PROPERLY INCLUDED IN THE MAPR CALCULATION

MAPR "is the cost of the consumer credit expressed as an annual rate" 32 C.F.R. § 232.3(p). "The finance charge is the cost of consumer credit as a dollar amount." 12 C.F.R. § 1026.4(a). "It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." *Id.*; 32 C.F.R. § 232.3(n) ("Finance charge has the same meaning as 'finance charge' in Regulation Z"). This includes fees charged by third parties where the creditor "requires the use of a third party as a condition of or an incident to the extension of credit." 12 C.F.R. § 1026.4(a)(1)(i).

Defendants have created a loan product that includes a refund-processing structure that deducts Tax Product and TurboTax fees, in addition to other fees, from borrowers' intercepted tax refunds under the mandatory repayment mechanism described above, in the amounts the refund-processing agreement itemizes. Compl. ¶¶ 97–100; Brock Decl., Ex. E §§ 3, 4, 7. A single qualifying finance charge is enough to bring the Loan within the MLA's definition of "consumer credit." 32 C.F.R. § 232.3(f)(1)(i). Any additional account and/or processing fees, and the class-wide fee structure, go to a different question: whether the required charges push the MAPR past 36%. At the pleading stage the Court need not resolve the treatment of every fee. Coverage attaches once one finance charge is present, and the MAPR claim survives so long as the pleaded charges plausibly exceed the 36% cap.[2]

[2] Plaintiff's account records are in Defendants' exclusive possession as Plaintiff has indicated he can no longer access relevant accounts. Courts have refused to credit a lender's account records over the complaint at the pleading stage, *Orubo*, 826 F. Supp. 3d at 1074–75 (denying motion for judgement on the pleadings, which court viewed as improper motion for reconsideration, where defendant relied on plaintiff's transaction histories) and the Ninth Circuit permits pleading on information and belief where the facts are peculiarly within the defendant's possession and control. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017). Because Plaintiff's Loan proceeds were disbursed into the required MVB account, and the account agreement imposes the alleged fees on account activity, it is a reasonable inference, which the

**A. A Fee Need Not Be Mandatory to Qualify as a Finance Charge.**

Courts have consistently rejected the argument that only strictly mandatory fees are finance charges. "[E]ven though a lender may not require a particular loan feature, the feature may become a term of the credit if it is included," and where a feature is "included for an additional charge," that charge "properly represents part of the finance charge for that particular loan, even though less costly loans may be available without that feature." Truth in Lending, 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996) (Federal Reserve Board); *Ramirez*, 828 F. Supp. 3d at 1049–50; *Orubo*, 780 F. Supp. 3d at 937. "Impose" "connotes an exercise of authority by the party setting the charge, not a requirement that the charge be unavoidable by the party paying it." *Feeman*, 826 F. Supp. 3d at 527.

In *Russell*, the plaintiffs argued, and the court agreed, that fees for immediate or expedited access to funds are finance charges where the speed of the disbursement is "an essential and defining aspect" of the credit product, because such fees must be paid "in order to reap the advertised benefits." 812 F. Supp. 3d at 1010–11. Similarly, *Ramirez*, by way of TILA-to-MLA analogy, further supports the proposition that under the MLA "non-required fees may nonetheless constitute finance charges" and "the Court's obligation [is] to interpret [TILA] liberally with a focus on substance over form." 828 F. Supp. 3d at 1047–49. These cases solidify that, post-*Pfennig*, the "necessary connection" does not require that fees be mandatory prerequisites to the extension of credit, but only that they share a connection to the extension of credit.

The Refund Advance is sold on speed. TurboTax advertises same-day access, and the Loan Agreement promises funds within two hours of IRS acceptance. Compl. ¶ 3 (Loan allows "taxpayers to receive a portion of their anticipated federal refund shortly after filing, often the same day"); Brock Decl., Ex. B at B-2. The fee-bearing accounts are the machinery that delivers and collects on that promise.

---

Court must draw in Plaintiff's favor, that he incurred at least some of those charges. Compl. ¶ 93; Brock Decl., Ex. D at 16.

Defendants' fees are similar to the fees examined in *Russell* and *Ramirez*, fees found to be incidental to the extension of credit. Important to the court's analysis in *Russell* was the plaintiff's allegation regarding being required to pay a fee for expedited use of their funds, stated differently, to "reap the advertised benefits." 812 F. Supp. 3d at 1010. Here, Plaintiff's allegations are not dissimilar. Defendants' assertion that these fees should not be considered a finance charge because they are not mandatory or there are free alternatives is not supported by *Orubo*, *Russell*, *Ramirez*, *Revell*, *Feeman*, or *Pfennig*.

**B. Whether Fees Were Imposed as a Condition of Credit Is a Factual Question Not Resolvable at the Pleading Stage.**

Whether each challenged fee ultimately qualifies as a finance charge connected to the extension of credit is a factual question that should not be resolved against Plaintiff on the pleadings.

Intuit's and FCB's fee-by-fee attempt to recast each charge as a separate, optional banking product ignores how the Complaint actually describes the transaction: a single, integrated program in which the Loan cannot be obtained without Credit Karma Spend account, that account must be issued by MVB, it is separate from the temporary deposit account that is also required to obtain the Loan, which is necessitated by the overall scheme here because SBTPG must have access to the borrower's tax refund so that it can intercept the fees. Compl. ¶¶ 7–8, 58, 61–65, 67, 76, 91.

The Complaint alleges the TurboTax-related fees, the Credit Karma account fees, and the Return Item and Account Research and Processing Fees were each "incurred incident to and as a practical condition of receiving the Refund Advance Loan." Compl. ¶¶ 65, 68, 73, 77, 100. And, further, the Complaint alleges that the required accounts through which those fees are charged are "not optional or incidental; [they are] a condition of obtaining the loan" and "a condition of receiving loan proceeds." Compl. ¶¶ 65, 77. Defendants' motions do not dispute that these fees

exist or that borrowers are routed through this account structure. Instead, they dispute only the legal characterization of facts the Complaint has already pleaded. That is precisely the kind of factual dispute *Russell* and *Ramirez* hold cannot be resolved against a plaintiff at the pleading stage. In any event, the allegations above independently demonstrate a "necessary connection" and plausibly state that the MAPR exceeds 36%. 541 U.S. at 240–41; 10 U.S.C. § 987(b).

**C. The Comparable-Cash-Transaction Exclusion Does Not Apply.**

Regarding "comparable cash transactions," the governing test asks whether "[c]harges imposed uniformly in cash and credit transactions" and the creditor must "compare the credit transaction in question with a similar cash transaction." 12 C.F.R. Pt. 1026, Supp. I, ¶ 4(a)-1. "Only charges imposed on a credit sale that are not imposed on a cash sale may be considered finance charges." *Holbert v. Fremont Inv. & Loan*, 179 Cal. App. 4th 1067, 1079 (2009); *accord Thompson v. 10,000 RV Sales, Inc.*, 130 Cal. App. 4th 950, 967 (2005). The comparison required is to the specific transaction, not the creditor's broader menu of products.

*Holbert* supplies the frame. The lender there argued a prepayment penalty was excluded because it applied whether satisfied "in cash or with a refinance." 179 Cal. App. 4th at 1079. The court rejected that argument because the exclusion reaches only charges imposed "regardless of whether [the customer] pays by cash or credit," and "[t]here is no 'comparable cash transaction' to the creation of the [loan]." *Id.* Similarly, here, the fees occupy the same position. The refund-interception deductions exist only to effectuate the extension and repayment of credit. A cash customer, i.e., one who pays the preparation fees upfront and directs the refund to an existing account, does not open a Green Dot account, use SBTPG's deduction process, or obtain the required Credit Karma/MVB account and debit card. These repayment-related charges have no analogue in a comparable cash transaction.

Intuit relies on *Basile v. H&R Block, Inc.*, for the proposition that tax-preparation fees are categorically excluded because the same fee applies whether or

not the customer takes the Loan. 897 F. Supp. 194 (E.D. Pa. 1995). *Basile* does not compel dismissal here for the same reason *Tripp*, *Huertas*, and *White* do not: each of those decisions rested on an evidentiary record, not a pleading, establishing that the fee was charged uniformly to cash and credit customers for a genuinely transaction-neutral service. *Tripp v. Charlie Falk's Auto Wholesale Inc.*, 290 F. App'x 622, 628 (4th Cir. 2008); *Huertas v. Foulke Mgmt. Corp.*, 2021 WL 5755081, at *2 (3d Cir. Dec. 3, 2021); *White v. Diamond Motors, Inc.*, 962 F. Supp. 867, 871–72 (M.D. La. 1997).

The Regulation Z staff commentary sets the rule for this exact product. In a refund anticipation loan:

> to the extent that any fees charged in connection with the loan (such as for filing the tax return electronically) exceed those fees for a comparable cash transaction (that is, filing the tax return electronically without a loan), the difference must be included in the finance charge

12 C.F.R. Pt. 1026, Supp. I, Part 2. What Bostick's transaction cost against a loan-free filing is an arithmetic question that requires a record.

Furthermore, Intuit argues that ATM fees are categorically excluded because they mirror fees "many bank customers" pay industry-wide. ECF No. 31 at 19. MVB adopts that argument. ECF No. 35 at 6 (incorporating Intuit MTD with no further argument). Intuit rests that point on a since-terminated CFPB sandbox order, which it says establishes that out-of-network ATM fees are "comparable fees charged in the context of non-credit products." ECF No. 31 at 19. First, the order never mentions "out-of-network ATM fees" – the only ATM fee reference is the order is to Payactiv's in-network ATMs being fee free. *Payactiv, Inc.*, Compliance Assistance Sandbox Approval Order at 5 (C.F.P.B. Dec. 30, 2020), https://files.consumerfinance.gov/f/documents/cfpb_payactiv_approval-order_2020-12.pdf (hereinafter the "Payactiv Approval Order"), *terminated by* Order to Terminate Sandbox Approval Order (C.F.P.B. June 30, 2022),

https://files.consumerfinance.gov/f/documents/cfpb_payactiv_termination-order_2022-06.pdf.

*Revell* does discuss the Payactiv Approval Order, and does use the quoted phrase "out-of-network ATM fees" in determining "the CFPB's analysis in the Payactiv Approval Order does not bear on the Court's determination that Defendants' expedite fees meet the definition of a finance charge." 808 F. Supp. 3d at 1052. Intuit's rewrite of that language into a statement about ATM fees is its own gloss, not the Bureau's. The order carries little, if any, weight regardless. By its terms it was "limited solely to Payactiv," applied to no other entity, was no "endorsement" of the product, and rested on a program that is the mirror image of this one: Payactiv did "not directly or indirectly assess the credit risk of individual employees, including through obtaining and reviewing credit reports," charged "at most, a non-recurring $1 fee," and imposed no periodic fees on its account. Payactiv Approval Order at 1–4; 6–7. Here, FCB pulls credit reports and makes a "credit decision." Brock Decl., Ex. B § F. Additionally, the required MVB account carries its own fee schedule, including a $2.50 out-of-network ATM fee. Brock Decl., Ex. D at D-17.

Most fundamentally, the Payactiv Approval Order rested on the premise that Payactiv's program involved no Regulation Z credit, and it "expresse[d] no view" on "[w]hether the $1 fee . . . would amount to a finance charge in an . . . advance program under which Regulation Z credit was offered or provided." Payactiv Approval Order at 8. Here, FCB admits it makes Loans. ECF No. 32 at 1. Thus, the extension of credit is conceded. The one question this case presents is the one question the Payactiv Approval Order declined to answer.

*Veale v. Citibank, F.S.B.* does not carry Defendants further. 85 F.3d 577 (11th Cir. 1996). *Feeman* confines *Veale* to charges for a genuinely ancillary third-party service the consumer could have bought outside the transaction. 826 F. Supp. 3d at 530. The debit card here is not an outside convenience, instead it is the physical key to a mandatory account holding the Loan proceeds. Even a fee excluded from the

Regulation Z finance charge qualifies for inclusion in the MAPR if it is a charge for a required "credit-related ancillary product" or a participation-type cost. 32 C.F.R. § 232.4(c)(1). That independent basis for MAPR inclusion holds even if the debit-card and ATM fees are not Regulation Z finance charges, as addressed below.

Finally, the same is true of the two contingent SBTPG charges, the $30 Return Item Fee and the $30 Account Research and Processing Fee. Intuit, FCB, and the Green Dot Defendants argue that these fees cannot be finance charges because they are contingent and avoidable, and are best analogized to the overdraft, late-payment, and insufficient-funds fees that courts have held fall outside TILA's finance-charge definition. *See In re Wash. Mut. Overdraft Prot. Litig.*, 201 F. App'x 409, 410 (9th Cir. 2006); *Vega v. First Fed. Sav. & Loan Ass'n of Detroit*, 622 F.2d 918, 922–23 (6th Cir. 1980); *Nicolas v. Deposit Guar. Nat. Bank*, 182 F.R.D. 226, 230 (S.D. Miss. 1998). Those decisions are distinguishable. Overdraft, late-payment, and insufficient-funds fees are triggered by a borrower's own default or shortfall, conduct wholly unrelated to how the underlying credit was structured or repaid. The opposite is true here. The Return Item and Account Research and Processing Fees are contingent charges built into the very mechanism SBTPG designed to intercept and process Plaintiff's refund. They are triggered by processing events, such as a rejected deposit or a disputed or flagged return. Those events are incidents of the refund-interception infrastructure itself, not of any borrower default. Whether that structural connection to the Loan's repayment mechanism is closer to the fees at issue in *Russell* and *Ramirez* than to the borrower-default fees in *Washington Mutual*, *Vega*, and *Nicolas* is, at a minimum, a factual question that should not be resolved on the pleadings.

Defendants' reliance on *Pechinski v. Astoria Federal Savings & Loan Association* is equally unavailing. 345 F.3d 78 (2d Cir. 2003). There, the assignment fee arose when the borrowers independently requested that their mortgage be assigned to another lender as part of a refinancing. The court affirmed the lower

court's holding and held that the fee was incident to the extinguishment of the debt, not the extension of credit. *Id*. at 80–82.

In short, the comparable-cash-transaction exclusion does not apply here.

**D. The Timing of a Fee Relative to Origination Does Not Defeat Its Status as a Finance Charge.**

If post-origination timing alone exempted a fee, any creditor could disburse proceeds into a fee-bearing account of its own design, advertise the loan as "0% interest," and extract substantial fees while claiming MLA exemption because the fees technically arose after origination. The test is whether the fee is connected to the credit, not when it arose. Truth in Lending, 61 Fed. Reg. at 49239; *Russell*, 812 F. Supp. 3d at 1009; *Ramirez*, 828 F. Supp. 3d at 1049–51. Here, the refund-processing terms, including the fees, were fixed in the loan and refund-processing paperwork before Plaintiff's refund was intercepted. Compl. ¶¶ 61–63, 96–99.

**E. Plaintiff Does Not Allege the Principal Is Part of the Finance Charge.**

Intuit and FCB argue that Plaintiff's MAPR theory improperly sweeps in the Loan principal, because the MAPR is calculated by dividing the finance charge by the amount financed and including the principal in the numerator would render every loan usurious. That argument overreads the Complaint. Paragraph 71 describes, as a factual matter, everything the "Processor or the Bank" is authorized to deduct from the Green Dot account before any remainder is disbursed to Plaintiff. The four-item list includes Tax Product fees, TurboTax preparation and processing fees, "[t]he full amount of any Refund Advance Loan," and fees for additional products. *Id*. The following paragraphs narrow the finance-charge theory to "[t]hese fees" (the Tax Product, TurboTax, and processing charges) as distinct from the loan amount itself, which is of course also deducted from the same account because that is how repayment occurs. Compl. ¶¶ 72–73.

To the extent any paragraph could be read to suggest the principal itself is part of the MAPR numerator, Plaintiff wants to be clear here: ***that is not the theory of***

***this case***. The MAPR claim rests on the fees identified throughout this brief, each independently alleged to be incident to or a condition of the extension of credit, and Intuit's principal-based critique does not touch that fee-based theory. Compl. ¶¶ 11, 62–63, 65, 68, 71(a)–(b), (d), 72–73, 98–100.

**F. The Participation-Fee and Ancillary-Product Regulations Bring These Charges Within the MAPR Regardless of the Comparable-Cash Analysis.**

Even if the Court were to conclude that any of the fees discussed above could qualify for the Regulation Z comparable-cash-transaction exclusion, that would not end the inquiry. The MLA's MAPR regulation independently requires inclusion of "[a]ny fee imposed for participation in any plan or arrangement for consumer credit" and "[a]ny fee for a credit-related ancillary product sold in connection with the credit transaction." 32 C.F.R. § 232.4(c)(1)(ii)–(iii); *see also MoneyLion Techs. Inc.*, 799 F. Supp. 3d at 162. Critically, the regulation goes further than Regulation Z on this exact point: "[a]ny charge set forth in paragraphs (c)(1)(i) through (iii) of this section shall be included in the calculation of the MAPR even if that charge would be excluded from the finance charge under Regulation Z." 32 C.F.R. § 232.4(c)(1)(iv).

The Department of Defense adopted this participation-fee category for the reason presented here. In the 2015 final rule, the Department determined that "an application fee or participation fee is an element generally required to be included when computing the MAPR." 80 Fed. Reg. 43560, 43563 (July 22, 2015). The Department explained why. Without that rule, a creditor would "have a strong incentive to evade the interest-rate limit by shifting the costs of a credit product," offering a below-limit interest rate and "imposing (or increasing) one or more of those fees." *Id.* at 43569. The Department warned that a creditor could impose an application or processing fee "regardless of whether formally tied to or nominally associated with the costs of processing the application," to replace interest revenue with fee revenue. *Id.*

Courts have sustained that approach. In *MoneyLion Techs. Inc.*, the court upheld the rule's inclusion of participation fees in the MAPR and rejected the substantive and arbitrary-or-capricious challenges to it. *CFPB v. MoneyLion Techs. Inc.*, 799 F. Supp. 3d 152 (S.D.N.Y. 2025). Similarly, the District Court for the District of Columbia credited the Department's view that the MLA's definition of "interest" reaches "all cost elements associated with the extension of credit, including fees." *Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.*, 240 F. Supp. 3d 206, 222 n.8 (D.D.C. 2016) (emphasis omitted).

### G. FCB's "$0.00 in Fees" Disclosure Cannot Resolve the Finance-Charge Dispute at the Pleading Stage.

A court may not use the incorporation-by-reference doctrine to resolve disputed facts or defeat a plausible claim. *Khoja*, 899 F.3d at 998, 1014. And where reliance is inappropriate, a court "will not consider these documents for the truth of the matters asserted therein." *In re Bare Escentuals*, 745 F. Supp. 2d at 1067. FCB's disclosure describes only what FCB charges under its own agreement. It says nothing about the separately imposed TurboTax, MVB account, and Green Dot/SBTPG processing fees, which co-Defendants charge through the same integrated repayment mechanism, and it cannot resolve whether those fees are "finance charges" under the MLA's transaction-wide MAPR framework. Compl. ¶¶ 66–68, 100. Whether those fees belong to the transaction as a whole is a factual, transaction-wide question that a court cannot resolve on a Rule 12(b)(6) motion.

No Defendant escapes by pointing at the others. The MAPR measures the cost of the credit transaction, not a per-Defendant ledger. Regulation Z reaches charges imposed "indirectly" and by required third parties. 12 C.F.R. § 1026.4(a), (a)(1). The MLA's MAPR categories reach further. The Green Dot Defendants argue that Plaintiff "cannot aggregate fees allegedly associated with other entities." ECF No. 33-1 at 13. That argument describes the MAPR calculation working as designed.

Liability turns on which entities are creditors or assignees as to the over-cap extension of credit, not on whose name appears on each line of the fee schedule.

## V. PLAINTIFF HAS STANDING FOR EACH COUNT

Intuit, FCB, and the Green Dot Defendants move to dismiss under Rule 12(b)(1) arguing that Plaintiff never paid the out-of-network ATM fee or the contingent SBTPG fees and that no Defendant compelled him to arbitrate, so nothing concrete happened to him.[3] On a facial standing challenge, the Court accepts the Complaint's allegations as true. *Nat'l Urb. League v. Ross*, 508 F. Supp. 3d 663, 684 (N.D. Cal. 2020). Plaintiff's allegations describe three concrete injuries.

First, Plaintiff suffered a concrete, out-of-pocket economic injury when SBTPG deducted Tax Product and TurboTax fees from his intercepted federal refund before releasing the remainder to him. Compl. ¶¶ 97–100. If Defendants extended credit above the 36% MAPR cap or on prohibited terms, the contract was "void from the inception." 10 U.S.C. § 987(f)(3). Money collected through a void credit contract is a concrete economic injury. *Wood v. Omni Fin. of Nev., Inc.*, 2023 WL 3766524, at *7 (E.D. Va. May 31, 2023) (plaintiffs' theory "is not a bare statutory violation of the MLA, but rather a resulting economic injury" from payments on loans void from inception); *accord Huskey v. Wyndham Vacation Resorts, Inc.*, 2026 WL 604875, at *3 (M.D. Fla. Feb. 19, 2026) ("The MLA prohibits creditors from charging interest except as specified therein. 10 U.S.C. § 987(a). Plaintiffs allege that Defendants charged interest that did not comply with the MLA. Thus, the alleged injury-in-fact – paying interest – is certainly traceable to the alleged unlawful behavior – charging and collecting interest that violates the MLA."); *Steines v. Westgate Palace, L.L.C.*, 2025 WL 3776911, at *2 (M.D. Fla. Dec. 8, 2025).

---

[3] Although Defendants' briefs ostensibly incorporate one another, either in whole or in part, MVB seemingly admits that Plaintiff did pay out-of-network ATM fees. ECF No. 35 at 6 ("the standard, out-of-network ATM fees that Plaintiff chose to pay MVB are not a basis for an MLA claim").

Second, Plaintiff was deprived of the use and control of his own property. The program routed his entire federal refund into an account he could not access, deducted fees and the Loan payoff, and released the remainder only on Defendants' schedule. Compl. ¶¶ 95–100. The Ninth Circuit treats even a temporary loss of the use of money as concrete, noting that "every day that a sum of money is wrongfully withheld, its rightful owner loses the time value of the money." *Van v. LLR, Inc.*, 962 F.3d 1160, 1163–64 (9th Cir. 2020) (quoting *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 457 (7th Cir. 2010)).

Third, on Count III, Defendants extended credit on terms that required Plaintiff to accept arbitration provisions, class waivers, and jury waivers. The prohibited act is extending credit on those terms, and it occurs at origination. 10 U.S.C. § 987(e)(3). A separate provision governs enforcement of such a clause. *Id*. § 987(f)(4). The MLA fixes damages for that violation at "not less than $500 for each violation," 10 U.S.C. § 987(f)(5)(A)(i). And the resultant harm bears a close relationship to the unconscionable-contracting and illegal-contract harms courts have long redressed, which is the inquiry *TransUnion LLC v. Ramirez* requires. 594 U.S. 413, 422–29 (2021); *and see Attias v. CareFirst, Inc.*, 346 F.R.D. 1, 8–10 (D.D.C. 2024) (breach of contract itself concrete, nominal damages suffice).

Courts sustaining MLA claims on these exact facts confirm standing. First, in *Lingard v. Holiday Inn Club Vacations, Inc.*, covered borrowers challenged arbitration and class-waiver provisions no defendant had enforced. 2023 WL 4661963, at *5 (M.D. Fla. July 20, 2023). That court found sufficient standing where the "Plaintiffs allege that the presence of the arbitration and class action waiver provisions in the timeshare financing agreements make them 'void from inception' under the MLA, not merely that the terms themselves are unenforceable." *Id*. Continuing, the *Lingard* court explained:

> The alleged economic harms flowing from these allegedly void agreements, which Defendants seek to enforce, thus give Plaintiffs a

> concrete injury to provide Plaintiffs standing to challenge the agreements, even when Defendants have not enforced or threatened imminent enforcement of the specific terms which make the agreements void. At bottom, Plaintiffs plausibly allege far more than statutorily noncompliant financing agreements alone and thus also satisfy the injury-in-fact element of Article III standing.

*Id*.

*Louis v. Bluegreen Vacations Unlimited, Inc.* does not hold otherwise. 2024 WL 2873778, at *2 (11th Cir. June 7, 2024). The *Louis* plaintiffs conceded they "did not allege that their down payment was made because" of the disclosure and arbitration violations they pleaded. *Id*. at *2. Courts since have confined *Louis* to that concession. *Huskey*, 2026 WL 604875, at *2–*3 (M.D. Fla. Feb. 19, 2026) (discussing standing and finding *Louis* "distinguishable" where the payment "was caused by Defendants' alleged unlawful charging of interest")*;* *Steines*, 2025 WL 3776911, at *1–*2 (also finding *Louis* "distinguishable").

Plaintiff pleads that he was "required to electronically sign" the waiver-laden agreements as the condition of "applying for and receiving" the very credit that intercepted his refund and deducted his fees. Compl. ¶¶ 80, 92, 102, 105. This is the connection *Louis* lacked. In short, Plaintiff has sufficiently pleaded standing and, as such, the Rule 12(b)(1) challenge fails.

## VI. COUNT I STATES A CLAIM UNDER THE MLA'S ACCOUNT-ACCESS PROHIBITION

Section 987(e)(5) makes it unlawful for a creditor to "[use] a check or other method of access to a deposit, savings, or other financial account maintained by the borrower ... as security for the obligation." 10 U.S.C. § 987(e)(5). The Complaint pleads the mechanism step by step and expressly characterizes it as the violation the statute prohibits. Compl. ¶¶ 22, 64, 134–37, 141–42. As a condition of the Loan, Plaintiff was required to authorize Green Dot to open an account for the sole purpose

of receiving his federal tax refund. *Id.* ¶¶ 96–97, 141. Furthermore, SBTPG automatically deducted the Loan balance and associated fees from that account before releasing any remainder to Plaintiff. *Id.* ¶¶ 62–63, 96–98. The Complaint alleges directly that "[t]his repayment mechanism constitutes an unlawful method of using access to a deposit account and federal tax refund proceeds as security for the obligation." *Id.* ¶¶ 64, 141.

The agreements say the same thing. The Loan Agreement takes an assignment of the refund and "a security interest in the same," which the borrower "may not revoke." Brock Decl., Ex. B § I. The refund-processing agreement tells the borrower the advance "IS A LOAN SECURED BY YOUR TAX REFUND(S)." *Id.*, Ex. E § 1. The Green Dot Defendants' own memorandum describes the transaction as "a loan secured by Plaintiff's tax refund." ECF No. 33-1 at 8. Defendants' "this is a repayment arrangement, not security" framing belies their contracts and their briefs.

Defendants' invocation of the regulatory safe harbors, 32 C.F.R. § 232.8(e)(1) & (3), does not compel the Court to dismiss Plaintiff's claims. As discussed in Section II, Defendants assessed fees that are considered finance charges, and if properly calculated as finance charges, pushes Plaintiff and the putative class's loans to an MAPR above 36%. *See also* Compl. ¶¶ 12, 74–75, 160. Because the safe harbor only applies to loans that comply with applicable law – including the MAPR's 36% cap – Defendants cannot invoke the safe harbor. § 232.8(e). Additionally, the § 232.8(e)(3) safe harbor covers security interests in "funds deposited after the extension of credit," but FCB took its irrevocable assignment of the refund itself at origination, before any deposit existed. Brock Decl., Ex. B § I ("You may not revoke this security interest or any assignment"). As such, reliance on any § 232.8(e) safe harbor is misplaced and does not warrant dismissal.

Finally, the Green Dot Defendant's argument that the account is not "maintained by the borrower" fares no better here than it does as a creditor-status argument. The Green Dot account was opened to receive Plaintiff's own incoming

tax refund and exists to hold and disburse his funds. The fact that a bank-affiliated entity serves as depository no more makes the account "not maintained by the borrower" than an ordinary checking account ceases to be the depositor's because a bank holds it. At a minimum, whether an account established for, funded by, and disbursed to the borrower is "maintained by the borrower" presents a factual question that cannot be resolved against Plaintiff on the pleadings.

## VII. COUNT III STATES A CLAIM: THE ARBITRATION AND WAIVER PROVISIONS VIOLATE THE MLA

Defendants argue Plaintiff's arbitration claim fails because: (i) the Loan Agreement contains a savings clause exempting covered borrowers (ECF No. 31 at 24 (Intuit); ECF No. 32 at 14–15 (FCB)); (ii) no Defendant has moved to compel arbitration (ECF No. 33-1 at 13 (the Green Dot Defendants)); and (iii) the MLA provides no standalone cause of action for inclusion of an arbitration term (ECF No. 31 at 25 (Intuit)). Each argument fails.

### A. The MLA's Dual Prohibition Framework.

Section 987(e)(3) makes it unlawful for a creditor to extend consumer credit through an agreement "requiring the borrower to submit to arbitration." Section 987(f)(4) independently provides that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable" against a covered member, without any qualification for voluntariness. Agreements containing such provisions are "void from the inception." 10 U.S.C. § 987(f)(3).

The Eleventh Circuit has held that if the MLA applies to a contract involving consumer credit, courts cannot enforce any agreement in that contract to arbitrate any dispute, including delegation clauses, because the MLA displaces the FAA for the arbitrability question itself. *Steines v. Westgate Palace, L.L.C.*, 113 F.4th 1335, 1343–45 (11th Cir. 2024). The Fourth Circuit agrees. *See Espin v. Citibank, N.A.*, 126 F.4th 1010, 1019 (4th Cir. 2025) (stating "With respect to their MLA claims, the

plaintiffs point out correctly that Congress did indeed explicitly override agreements to arbitrate" and ultimately remanding for lower court to assess MLA applicability).

Any delegation clause falls with the rest: the MLA displaces the FAA "for all disputes, including those involving the arbitrability question itself," so this Court – not an arbitrator – decides whether the MLA applies. *Russell*, 812 F. Supp. 3d at 1007; *accord Steines*, 113 F.4th at 1344–45. A district court in this Circuit has adopted that reasoning to reject arbitration of MLA claims. *Vickery v. Empower Fin., Inc.*, 2025 WL 2841686, at *4, *8 (N.D. Cal. Oct. 7, 2025) ("no lawful or enforceable arbitration agreement exists" between a covered borrower and a creditor extending consumer credit); *accord Burrison v. FloatMe, Corp.*, 2026 WL 444638, at *3–*5 (D. Mass. Feb. 17, 2026); *Feeman*, 826 F. Supp. 3d at 532 (quoting *Steines*). Section 987(e)(3) is not a marginal example of a statutory arbitration override; the Supreme Court itself has identified it as an example of Congress overriding the FAA when it wishes to. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 514 (2018).

The Complaint does not allege a single, generic arbitration clause – it alleges that Plaintiff was forced into duplicate, independent arbitration exposure through separate agreements he had to sign or agree to as part of completing this one overarching transaction. The Loan Agreement itself "provides that it contains a Mutual Dispute Resolution and Arbitration Provision and Jury Trial and Class Action Waiver governing disputes regarding the loan." Compl. ¶ 103. Independently, the refund-processing agreement Plaintiff had to sign so that his refund could be routed through Green Dot "likewise contains an arbitration provision requiring claims to be decided by binding arbitration and prohibiting class or representative actions." Compl. ¶ 104. Plaintiff was "required to electronically sign" both sets of provisions "in connection with applying for and receiving the Refund Advance Loan." Compl. ¶¶ 92, 102. Each agreement, standing alone, states a violation of § 987(e)(3) and renders that agreement void under § 987(f)(3) and (f)(4) – Plaintiff need not choose between them, and Defendants' motions do not explain why exposing a covered

borrower to multiple independent, stacked arbitration provisions in a single transaction should be treated any differently than one.

**B. FCB's Savings Clause Does Not Resolve the Arbitration Count.**

FCB's motion and Intuit's motion both point to bold, all-capital-letters language in the Loan Agreement stating that arbitration does not apply if the borrower is "A COVERED BORROWER UNDER THE MILITARY LENDING ACT." That carve-out, even assuming it is effective, resolves at most the arbitration provision in the Loan Agreement itself; it says nothing about the second, independent arbitration provision in the Green Dot/SBTPG refund-processing agreement, which the Complaint alleges Plaintiff was separately required to sign and which contains no comparable carve-out. Compl. ¶ 104. MVB's Credit Karma Money Spend Account Terms & Disclosures also contains an arbitration clause and class action waiver. Brock Decl., Ex. C.

First, the carve-out fails on its own terms. The covered-borrower parenthetical appears once, in the header notice on page one. The operative arbitration provision, Section R, defines who is bound and who is not: it "does not apply to residents of Illinois, Maine, New York or Wisconsin," and Minnesota residents receive separate opt-out rights. Brock Decl., Ex. B § R. Covered borrowers appear nowhere in that list. The drafters knew how to exclude categories of borrowers from the operative clause and excluded four states' residents while leaving service members to a single line multiple pages away. A reasonable covered borrower reading Section R could conclude he had agreed to arbitrate. Whether a header parenthetical "effectively" exempts covered borrowers within the meaning of the Department of Defense's interpretive guidance, 81 Fed. Reg. 58840, 58844 (Aug. 26, 2016) (Q&A 15), is at minimum a question of contract construction the Court cannot resolve against Plaintiff on the pleadings.

The Department itself warned, through notice-and-comment rulemaking, that a creditor "might minimize the prominence" of MLA-related statements "amidst

other … contract documents," leaving the borrower unable to "appreciate" the statute's protections. 80 Fed. Reg. 43560, 43586–87.

This is especially true here where the Loan Agreement's exclusion parenthetical proclaims to remove covered borrowers from "AN ARBITRATION PROVISION WITH A CLASS ACTION WAIVER" but the actual section of that agreement (§ R) goes one step further. That section also includes "MUTUAL DISPUTE RESOLUTION" which the header parenthetical does not exclude covered borrowers from. "Dispute Resolution" and "Informal Resolution" (§ R, ¶¶ 1–2), therefore still apply to covered borrowers, and, importantly, still violate the MLA by requiring onerous legal notice, including providing a "written description of the Claim and your contact information" to FCB, giving FCB "30 days within which to resolve the Claim to your satisfaction" and seemingly requiring "good faith negotiations under this informal process." *See* 10 U.S.C. § 987(e)(3) (unlawful to "impose[] onerous legal notice provisions in the case of a dispute").

To the extent Defendants contend the Loan Agreement's savings clause independently defeats liability even as to that agreement, the mere inclusion of prohibited arbitration provisions in a credit agreement presented to a covered borrower is itself unlawful under § 987(e)(3) – the statute makes it unlawful to "extend consumer credit" through an agreement that includes such provisions, not merely to enforce them. The harm occurs the moment the agreement containing the provisions is presented, regardless of a carve-out elsewhere in the same document. A savings-clause defense resting on the Department's uncodified 2016 interpretive guidance, 81 Fed. Reg. 58840, 58844 (Aug. 26, 2016) (Q&A 15), is entitled to no controlling deference post-*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024); at most it carries the weight its reasoning earns under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Q&A 15 is a single question-and-answer in a preamble that only addresses 32 C.F.R. § 232.8. It is uncodified, was never adopted through notice-and-comment, and is nowhere reflected in the codified rule – 32

C.F.R. § 232.8. To the extent Q&A 15 envisions a "savings clause," the Loan Agreement does not have one, it has a single parenthetical in the header of the document. Brock Decl., Ex. B.

Furthermore, Plaintiff is unaware of any court apply Q&A 15 to defeat a § 987 claim. Finally, whether any savings clause here is adequately prominent, clearly communicated, and effective in protecting Plaintiff's rights is, in any event, a factual inquiry not well suited for resolution at this stage of the case.

**C. The MLA's Civil Liability Provision Authorizes Suit for Unlawful Terms.**

Section 987(f)(5)(A) provides that "[a] person who violates this section" is civilly liable for actual damages "but not less than $500 for each violation," punitive damages, and fees. 10 U.S.C. § 987(f)(5)(A)(i)–(ii), (iv). The MLA supplies two independent bases for unenforceability. Section 987(e)(3) provides a prohibition on requiring arbitration and § 987(f)(4) guarantees covered borrowers their day in court regardless of whether the clause is voluntary or mandatory and regardless of whether the creditor has invoked it. *Vickery*, 2025 WL 2841686, at *8; *Steines*, 113 F.4th at 1343–45. The civil-liability provision does not limit recovery only to situations where a creditor has actually moved to compel arbitration. Inclusion of a prohibited arbitration provision – standing alone – is a cognizable basis for MLA liability. Compl. ¶¶ 105–106; *Revell*, 808 F. Supp. 3d at 1053–54 (class-action waiver within an unenforceable arbitration agreement is also unenforceable). A covered borrower's right under the MLA is to enter into a credit agreement that does not contain the prohibited terms.

As addressed above, Section R also conditions any claim on a written pre-suit demand and a 30-day "informal resolution" period. Brock Decl., Ex. B § R. The MLA separately prohibits creditors from "demand[ing] unreasonable notice from the borrower as a condition for legal action." 10 U.S.C. § 987(e)(4); Compl. ¶¶ 105, 173.

**D. A Third Arbitration Agreement Independently Supports This Claim.**

The Complaint alleges that, separate and apart from both the FCB Loan Agreement and the Green Dot Defendant's refund-processing agreement, "[t]he Credit Karma Money Spend account agreement likewise contains mandatory arbitration provisions and expressly forbids class actions." Compl. ¶ 81. Neither Intuit's nor FCB's motion identifies any MLA-covered-borrower carve-out in that account agreement.

Defendants' own exhibits confirm it: both versions of the account terms compel binding individual arbitration, forbid class actions, and preclude jury trial, with no covered-borrower exception anywhere. Brock Decl., Ex. C § X; Ex. D § IX. Because Plaintiff was required to open that account as a precondition of receiving the Loan, Compl. ¶¶ 58, 91–92, this is an independent, unaddressed basis on which the arbitration count survives as to Intuit, Credit Karma, and MVB regardless of how the Court resolves the FCB Loan Agreement's savings clause.

## VIII. THIS COURT HAS PERSONAL JURISDICTION OVER MVB BANK

MVB, a West Virginia-chartered bank, argues this Court lacks both general and specific personal jurisdiction over it. The relevant question is not whether Plaintiff unilaterally selected MVB, but whether MVB itself participated in a financial product marketed, distributed, and made available to California residents, including servicemembers stationed at California installations. By entering into an arrangement with Intuit to serve as the depository for a nationally marketed Loan product offered to California consumers, MVB's participation was a deliberate business decision, not a random, fortuitous, or attenuated contact of the kind purposeful-availment doctrine is designed to screen out. *Id.* ¶¶ 5, 36, 58–59, 91–92, 94. MVB chose its "program partner," CK Progress, Inc., an Oakland, California company, *Id.* ¶ 35, and chose to distribute its accounts through a Mountain View, California platform to that platform's customers. *Id.* ¶¶ 30, 33. Under *Burger King*

*Corp. v. Rudzewicz*'s factor-based approach, an ongoing relationship with forum companies, with continuing obligations to forum accountholders, is purposeful availment. 471 U.S. 462, 478–79 (1985).

The Ninth Circuit, sitting en banc, forecloses MVB's "nationwide product" defense: an interactive platform expressly aims its wrongful conduct at a forum "when its contacts are its own choice and not random, isolated, or fortuitous, even if that platform cultivates a nationwide audience for commercial gain." *Briskin v. Shopify, Inc.*, 135 F.4th 739, 749–53 (9th Cir. 2025) (en banc) (internal citation and quotations omitted). Personal jurisdiction over MVB is consistent with *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, which found that "[n]one of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do." 592 U.S. 351, 362 (2021). The relatedness here is direct: the claims arise in part from the required MVB account itself – its fee schedule and its arbitration clause. Courts have found personal jurisdiction on comparable facts. In *Garcia v. Truist Fin. Corp.*, the court found specific jurisdiction over a bank that purposefully directed conduct at California by marketing to and profiting from California consumers whose California addresses it collected at account opening. 825 F. Supp. 3d 1149, 1162–65 (C.D. Cal. 2026), *see also Zions Bancorporation, N.A. v. JPMorgan Chase Bank, N.A.*, 2021 WL 3406641, at *6 (S.D. Cal. Aug. 3, 2021) (deliberate business contacts directed into the forum satisfy purposeful availment even where the bank is headquartered elsewhere); *and Hidalgo v. JPMorgan Chase Bank, N.A.*, 2025 WL 1370488, at *3–*6 (S.D. Cal. May 12, 2025) (denying dismissal where an out-of-state bank's conduct was directed at a California resident and rejecting argument that the California plaintiff should be forced to litigate in the bank's home state). MVB's account was a prerequisite to moving through the Loan process and was the vehicle used to deliver Loan proceeds to a California-based MLA "covered member." Compl. ¶¶ 58 ("[t]he originating lender will not process a Refund Advance Loan application unless the borrower has

been approved for this required Spend Account…”), 76–77 (account is required), 92–94 (required account “is offered on behalf of [Credit Karma] as MVB Bank’s program partner”). Plaintiff’s MLA claims directly relate to MVB’s conduct in connection with a California-based transaction. California has a strong interest in protecting its servicemember residents from predatory lending practices the MLA prohibits, and MVB has not shown that litigating in California would be so burdensome as to constitute a due process deprivation. Transferring only MVB to West Virginia would fragment a single, integrated multi-party transaction into duplicative, piecemeal litigation, contrary to judicial economy.

Should the Court find the present record insufficient, Plaintiff requests limited jurisdictional discovery into MVB’s California-directed conduct. While not an exhaustive list at this stage of litigation, that discovery would target the program agreements between MVB and Credit Karma governing the Credit Karma Money Spend account and their renewal, together with MVB’s data on California accountholders, deposit balances, and fee revenue attributable to California accounts. Additionally, Plaintiff would also request documents showing MVB’s participation in deciding which states its Credit Karma-branded products are offered in and how those products are marketed to California consumers, facts bearing directly on whether MVB’s contacts with this forum were its own deliberate choice. Such requests would aid in the understanding MVB’s conduct towards California. *See generally Rodriguez v. Aquatic Sales Sols. LLC*, 735 F. Supp. 3d 1208, 1215, 1224 (C.D. Cal. 2024) (after jurisdictional discovery, court ruled “12.42% and 12.51% of defendant’s total sales were made to California residents, respectively. These facts are sufficient to suggest that defendant expressly aimed its conduct at California”); *Chapman v. Krutonog*, 256 F.R.D. 645, 649 (D. Haw. 2009) (required showing “should be understood as something less than a prima facie showing”) (citations and quotations omitted).

## IX. MVB'S VENUE MOTION FAILS

MVB also moves under Rule 12(b)(3), arguing the account agreement's West Virginia forum-selection clause makes this District an improper venue. Its own lead case forecloses the vehicle. *Atlantic Marine* holds that a forum-selection clause "does not render venue in a court 'wrong' or 'improper' within the meaning of § 1406(a) or Rule 12(b)(3)." 571 U.S. at 55–61 (but noting that 28 U.S.C. § 1404 transfer still permitted). Venue is measured against 28 U.S.C. § 1391 alone, and a clause can be enforced only through § 1404(a) or forum *non conveniens*. *Id*. at 59–61. Venue is proper here under § 1391(b)(2) as Intuit and Credit Karma marketed the product to Plaintiff in San Diego, he applied, contracted, and received credit here, and his refund was intercepted here. Compl. ¶¶ 29, 40–41. The 12(b)(3) motion should be denied on that ground alone.

Treated as a § 1404(a) motion, it fares no better, because the clause is unenforceable and the public-interest factors defeat transfer. First, if the account agreement is part of a credit transaction that violates the MLA, the contract is "void from the inception." 10 U.S.C. § 987(f)(3). A void agreement supplies no clause to enforce. Second, *M/S Bremen v. Zapata Off-Shore Co.* denies enforcement where it "would contravene a strong public policy of the forum." 407 U.S. 1, 15 (1972). That exception survives *Atlantic Marine* and suffices on its own. *Gemini Techs., Inc. v. Smith & Wesson Corp.*, 931 F.3d 911, 914–17 (9th Cir. 2019).

The Ninth Circuit has refused to enforce clauses that operate as a waiver of statutory consumer-protection rights and class remedies. *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1083–84 (9th Cir. 2009). The MLA is such a statute because it makes it unlawful to condition credit for covered borrowers on waivers of legal recourse or on onerous preconditions to suit, 10 U.S.C. § 987(e)(3) and voids offending contracts. The clause at issue here sits inside a compulsory adhesion contract that was itself a condition of the credit, and it would force a San Diego military spouse to litigate his MLA claims alone, in West Virginia, severed from other co-Defendants who would

remain here. Plaintiff's claims arise from an integrated loan transaction in which the MVB account was one required component, and reading the clause to funnel MLA claims about that transaction to West Virginia would let the instrument that violates the MLA dictate where the violation is brought and heard. Finally, even under pure § 1404(a) balancing, transfer of one defendant would splinter a single controversy. In short, the motion should be denied.

## X. IN THE ALTERNATIVE, LEAVE TO AMEND SHOULD BE GRANTED

Defendants request dismissal with prejudice. ECF No. 31 at 25; ECF No. 32 at 15; ECF No. 33-1 at 14–15; ECF No. 35 at 12–13. The Ninth Circuit strongly disfavors denying leave to amend unless amendment would be futile. "Dismissal without leave to amend is proper only if it is clear that 'the complaint could not be saved by any amendment.'" *Barton v. Procter & Gamble Co.*, 766 F. Supp. 3d 1045, 1056 (S.D. Cal. 2025) (quoting *Intri-Plex Techs. v. Crest Grp., Inc.*, 499 F.3d 1048, 1056 (9th Cir. 2007)).

Here, amendment is far from futile. Defendants, the parties here on which "demonstrating why denial is necessary" rests, have not carried their burden. *Cooper v. Tokyo Elec. Power Co., Inc.*, 166 F. Supp. 3d 1103, 1141 (S.D. Cal. 2015), *aff'd*, 860 F.3d 1193 (9th Cir. 2017). Plaintiff has not previously amended his Complaint. As such, dismissal with prejudice at this early stage would be inappropriate.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motions to Dismiss in their entirety. In the alternative, should the Court be inclined to dismiss any claim or any Defendant, Plaintiff requests leave to file an amended complaint.

Dated: July 27, 2026

Respectfully submitted,


/s/ Brandon M. Wise

Brandon M. Wise*
Domenica M. Russo*
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
One US Bank Plaza, Suite 1960
St. Louis, MO 63101
bwise@peifferwolf.com
drusso@peifferwolf.com
314-833-4827

**ALMEIDA LAW GROUP LLC**

Victor J. Sandoval, SBN 344461
victor@almeidalawgroup.com
3415 South Sepulveda Boulevard, Suite 1121
Los Angeles, CA 90034
Telephone: 562.534.5907

David S. Almeida*
david@almeidalawgroup.com
849 West Webster Avenue
Chicago, IL 60614
Telephone: 708.529.5418

*Counsel for Plaintiff and the Proposed Classes*

**pro hac vice*